# Appeal of Knauss, et al.

1. Under the 41st section of the Act of March 15th, 1832, P. L., 146, whenever a dispute upon a matter of fact arises before the Orphans' Court which, before the adoption of the Constitution of 1874, would have been before the Register's court, it becomes the duty of that court to direct a precept for an issue to the Court of Common Pleas of the county for the trial of said disputed fact.

2. In determining whether such a dispute, within the meaning of the 41st section of the Act of 15th March, 1832, has arisen as should be submitted to and passed upon by a jury there is only one safe rule. If the testimony is such that after a fair and impartial trial resulting in a verdict against the proponents of the alleged will, the trial judge, after a careful review of all the testimony, would feel constrained to set aside the verdict as contrary to the manifest weight of the evidence, it cannot be said that a dispute within the meaning of the Act has arisen. On the other hand, if the state of the evidence is such that the judge would not feel constrained to set aside the verdict, the dispute should be considered substantial, and an issue to determine it should be directed.

February 16th, 1886. Before MERCUR, C. J., PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ. GORDON, J., absent.

APPEAL from the Orphans' Court of *Lehigh County:* Of January Term, 1885, No. 387.

Appeal of Christiana Knauss and Catharine Seip, from the decree of said court, dismissing their appeal from the Register of Wills of Lehigh county, admitting to probate a paper purporting to be the last will and testament of George Probst, late of said county deceased, and refusing their demand for an issue.

The facts of the case appear in the opinion of the Court, SCHUYLER, P. J., of the third judicial district holding a special court.

By Act of March 15th, 1832, § 41 P. L., 146, it is provided that " whenever a dispute upon a matter of facts arises before any Register's court, the said court shall at the request of either party, direct a precept for an issue to the Court of Common Pleas of the county for the trial thereof." The new Constitution having abolished separate Register's courts and transferred their powers and jurisdiction to the Orphans' Courts, we are now asked to direct a precept for an issue to the Court of Common Pleas to try the facts whether or not the decedent, at the time he executed a certain paper purporting to be his last will and testament was of a sound and disposing mind. The single question is whether this fact is " disputed " within the spirit and meaning of the above recited Act of Assembly.

In addition to the allegations and denials contained in the pleadings we have before us a great mass of testimony covering nearly three hundred and fifty pages of foolscap, taken on behalf of the contestants and proponents respectively, and yet the question just stated is an open one. It is not pretended that a " dispute " within the meaning of the Act can be created by the pleadings alone ; and it is self-evident that the mere massing of evidence without respect to its strength or competency can have no greater effect. The simple test supported alike by reason and authority is supposing upon the evidence now before us, a jury should find against the will, ought such a verdict to be allowed to stand ? If not, then the issue should be refused : Burdone Estate, 11 W. N. 138 ; Gibson's Estate, Id. 355 ; Eddy's Estate, 14 Id., 551 ; Comb's Appeal, 15 Id., 250 ; DeHaven's Appeal, 25 P. F. S., 340 ; Dean v. Fuller, 4 Wr., 79 ; Schwilks' Appeal, 4 Out., 628.

As to what constitutes a sound and disposing mind there is no room for mistake, since the case of Wilson v. Mitchell, 5 Out., 502. " A man of sound mind and disposing memory," says TRUNKEY, J. in that case, " is one who has a full and intelligent knowledge of the act he is engaged in, the full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty. Neither age, nor sickness, nor extreme distress, nor debility of body will affect the capacity to make a will, if sufficient intelligence remains. The failure of memory is not sufficient to create the incapacity, unless it be total, or extend to his immediate family or property. The want of recollection of names is one of the earliest symptoms

.of the decay of the memory; but this failure may exist to a very great degree and yet the solid power of the understanding remain.

Turning now to the evidence we find that the paper, purporting to be the last will of decedent, was executed August 13th, 1880. At that time decedent was about eighty-one years of age, feeble in body, walking with a shuffling gait, and very slowly. He was an eccentric man; coarse and immodest in his manners and conversation, and dirty even to filthiness in his habits. He was never married. He had accumulated a large fortune; his estate at the time of his death aggregated between $350,000 and $400,000. He was close in money matters, even with his dealings with the poor; and yet he was not altogether devoid of kindly feelings, having lost heavily by endorsements for his friends whom he had been willing to help in that way. Among his other characteristics was one which for want of a better term may be called "devilishness," which manifested itself on one occasion in the girdling of a shade tree in front of the hotel where he boarded, and on others in using the napkins belonging to the hotel for water closet purposes, and on still others in using towels and the petticoats of the servant girls to kindle his fires. He would in the day time lie in his room, which was opposite the ladies' parlor naked with his door open, and on one or two occasions he exposed himself in the same condition in broad day-light on the front balcony of the hotel, which was located on a busy thoroughfare.

It is clear if there were nothing more in contestants' case than what is stated above, that the case would fail through its inherent weakness. There is nothing in decedent's age or physical condition to militate against his testamentary capacity. In Wilson v. Mitchell, *supra*, the will was sustained, although the testator was at the time of making it over one hundred years old, and much more feeble in body than was the present decedent. As to the decedent's eccentricity, as was said by LOWRIE, J. in McMaster's v. Blair, 5 Cas., 304: "An eccentric man is not intestable." The same is true of a filthy or even a devilish man. It may well be, if up to within a reasonable time prior to making his will, the decedent had been neat and tidy in his person and surroundings, and free from all vagaries of conduct, and had then suddenly changed, that this would be a circumstance which might be of considerable weight in passing upon his mental capacity, but the evidence does not establish this.

Thus far, therefore, there is no evidence that calls for an issue even if the proponents had not examined a single witness, and yet outside of the evidence to show failure of mem-

ory, which will be considered presently, there is nothing else in the case. The contestants seem to have spent most of their strength in bringing out the details in reference to the decedent's filthy habits. Many of these details are too disgusting for insertion here, nor is the insertion necessary. Some of these habits were the result of physical weakness; some were superinduced by faith in peculiar remedies which, whilst not universal, the evidence shows to be not uncommon. The habit of exposing his person may have sprung either from contempt for the conventionalities of society or from the spirit of devilishness above referred to. But whatever the explanation, nothing is more clear than that the mere existence of such habits and eccentricities is not inconsistent with the possession of a sound and disposing mind.

We come next to consider the evidence adduced to show want of memory on the part of decedent. We have seen that decedent was a man of large wealth, and yet he frequently complained of being poor, from which it was argued that he did not have, in the language of Wilson v. Mitchell, a "full knowledge of the property he possessed." But this we think is a *non sequitur*. The evidence discloses ample motive for these complaints of poverty without referring them to want of memory. As already stated the decedent had lost heavily by endorsements, and to say that he had lost all in this way, as he did say, whilst it might not be sound morality, was a pretty effectual way to put a stop to future importunities. Besides, these complaints were mostly made when he was trying to drive a close bargain. But speculation is unnecessary, since the fact that decedent made a will at all, and especially such a will that he did make, is a conclusive answer to this part of contestants' theory.

Nor do we think there is anything in the testimony of Mrs. Seip and Mrs. Knauss, half sisters of decedent, to the effect that he did not recognize them on a certain occasion. It is more than probable that the want of recognition was feigned. Decedent had never exhibited an overpowering affection for these half sisters. Although living within easy distance from them he had not visited them, nor they him, for many years. He may have suspected that their sudden interest in him was with an eye to testamentary bounty, and may have pretended not to know them, in order to get rid of them. He did remember one of them in his will, and gave her $1, thus showing that he had not forgotten her, at least. Of the same inconsequential character is the testimony of A. B. Knauss, to show that decedent had forgotten his full brother Henry. It is altogether probable that this forgetfulness was feigned also, for in his will he mentioned his brother, Henry, by name, and gives

his son a full share in his estate. The lapses of memory testified to by the Hottenstines, Hartzell, Danowsky and Dr. Nagle, are trifling in their character, and such as a man of decedent's age and infirmity might easily fall into without impairing in the least his testamentary capacity. That decedent, who always retired very early and arose very early, should awaken before the night was far spent on two or three occasions and go to the dining room for his breakfast, looking wild, is more naturally attributable to temporary disturbances than to any permanent impairment of his mental faculties.

The testimony of Dr. Fetherolf is not of much importance. This testimony is relied upon chiefly because of his opinion given on a hypothetical case. The value of his opinion is very much weakened by the cross-examination, but we think the opinion should be thrown out altogether, as was done in Wilson *v.* Mitchell, *supra*, because " in no just view of the evidence can such a case be found as he considered and passed upon." The hypothetical case assumed that the decedent " imagined himself to be poor," that he " did not recognize his relatives and friends ; " that " he did not recognize his sisters, taking the younger of them to be the mother of the other ; " that " he had forgotten his brother Henry ; " that " he bought things in the drug store and forgot to pay for them," which was more than a year after the will was made ; that " he imagined a young lady had called on him," and that " he imagined himself young," etc. Upon a question of testamentary capacity these are very serious allegations, but the trouble is that they are not facts either proved or admitted. They are merely the contestants' inferences, which we think unwarranted by the evidence. In this connection it may be noticed as a somewhat remarkable circumstance, that Dr. Fetherolf is the only one of contestants' witnesses who offers an opinion that decedent was not competent to make a will. It is true that such opinions are not of much positive value outside of the facts on which they are based, but the usual practice is to give them in evidence, if favorable to the party calling the witnesses, and the failure to do so naturally excites suspicion.

The only other evidence on the part of the contestants which we deem it necessary to notice, is the will itself, read in connection with the testimony of Nathan Seip. An examination of this testimony discloses the following peculiarities in the will :

1. Decedent gives to Hannah " Probst " and to Elizabeth " Probst " each $1, designating them by their maiden names, although they had both been married ; calling them his half-sisters, when they were his sisters of the whole blood ; and

treating them as still living when they had both been dead many years.

2. Decedent had one half-brother and three half-sisters. To the half-brother and to the one half-sister he gives $1 each, making no mention of the two other half-sisters.

3. Of his full brothers the only one living when the will was made was Henry, who has a son, George, and a daughter, Maria, who was married to a man by the name of Shoemaker. Henry takes nothing under the will; George, his son, gets a full share, whereas his daughter, Maria, gets but $1, and is described as " the daughter of the wife of my nephew, George Probst, intermarried to a man by the name of Shoemaker."

4. Of his full sisters the only one living is Rebecca Xander. She gets nothing under the will, but each of her seven children gets a full share. One of her sons is named Francis, who married a woman by the name of Balliet. In the will his name is given as Francis Balliet, but he is otherwise properly described.

5. Each of the two daughters of decedent's full brother, Jacob, gets a full share. They are both married, but are designated in the will by their maiden names, although they are otherwise sufficiently identified. The children of his full sister, Elizabeth, are not named in the will at all.

To all which there is this reply: It is not essential to testamentary capacity that the testator should be able to recall and describe with unerring accuracy the whole army of his collateral kindred. Even if he could do so, there is no presumption that he would give any of them a portion, for "a man without parents, wife or children, can scarcely be said to have natural objects of his bounty:" Stevenson v. Stevenson, 9 Casey, 472. It is enough, as has been seen, if the testator is able to remember his " immediate family," if he has such, and that he has " an intelligent perception and understanding of the persons he desires shall be the recipients of his bounty." That the decedent possessed such perception and understanding clearly appears from the will. He divides his whole estate into sixteen equal parts among the children of five of his brothers and sisters of the whole blood. Every one of these beneficiaries is described so that there is not the slightest doubt as to who they are, although they were widely scattered, some living in Ohio, some in Illinois, one in Iowa, and the rest in different parts of this state. Twelve out of the sixteen are married women, and ten of these are designated by their married names. It is true that two of the married nieces are designated by their maiden names, and that Francis Xander, a nephew, is called Francis Balliet, but these manifest slips are not of the slightest consequence, for, as stated

above, these three beneficiaries are otherwise sufficiently and fully identified.

But even if the testimony of contestants had excited a doubt as to the sanity of decedent, such doubt would have to entirely vanish on referring to the evidence on behalf of the respondents. The length which this opinion has already reached will forbid more than a brief notice of the case presented by proponents. Starting with the legal presumption in favor of testamentary capacity, and the sworn opinions of the subscribing witnesses to the will to the same effect, there is the testimony of the scrivener, which, if believed, and it is not questioned except as to the opinion expressed, is decisive of the present controversy in favor of the will. This witness says that he wrote the will from written memoranda prepared by decedent himself, the witness doing nothing more than reduce these memoranda to form. Decedent called upon witness alone and asked him to write his will. A time was appointed for the decedent to call again, and he did call again at the time appointed, when he received the will and took it away with him for examination. Having examined it decedent returned with it to the witness, pronounced the will all right, and asked the witness to make a copy of it, which was subsequently done. This witness was an old acquaintance of decedent, and gave it as his opinion that decedent's mind was sound.

Of the same opinion were Mr. Ainey and Mr. Cooper, both gentlemen of great intelligence and of the highest standing, entirely free from all suspicion of bias, well acquainted with decedent for many years, and with ample opportunities for forming a correct judgment. Mr. Cooper says, speaking of the years 1880, 1881, 1882 and 1883: "I neither saw nor noticed anything in decedent that would indicate other than a sound business mind." Mr. Ainey, speaking of decedent during the years 1880, 1881, and 1882 says: "I have no doubt that his mind was perfectly sound, and that he was capable of transacting business intelligently, and with a clear understanding and judgment of what he was doing."

· But of greater weight even than these opinions, are the undisputed facts as to the control exercised by the decedent over his large estate and business, down to July, 1882, nearly two years after the date of the will, when because of his increasing physical infirmities he voluntarily passed his affairs into the hands of Mr. Roeder. He kept an account in two banks, drawing checks on each; he rented his houses and collected the rents; he signed and acknowledged releases; he carried on law suits, in one of which as late as March 25th, 1881, he testified intelligently and without objection; he settled up his

own board bills, drawing up the receipts himself; he collected moneys other than rents due him, calculating the interest correctly; he kept up a running correspondence with his western agent, calling for statements from time to time. On May 10th, 1881, he contracted for a monument to mark his last resting place, which was subsequently erected and paid for by him, and in the summer of 1883 he subscribed $100, to be put at interest to keep his monument and cemetery plot in repair. He made no mistakes to his detriment and his right to control his affairs in his own way was disputed by no one. " When," says LOWRIE, J., in Stevenson v. Stevenson, *supra*, "a decedent has been permitted to go through life attending to his own affairs, and taking good care of his estate, it is too late, after he has made his will and died, for collaterals to discover that for six or eight years his mind had been under a cloud, and that it passed into total eclipse just at a moment of their disappointment."

I cannot better close this opinion than with the words of Judge KING in Leech v. Leech, 1 Phila., 245: " Too great facility," says that great judge, " given to the discontented and dissatisfied, desirous of impeaching last wills, invites to such experiments, which whether successful or otherwise, are sure to leave behind family discords and hostilities between those whom the laws of nature, the precepts of religion, and the interests of society require to live in unity. When men are, however, taught by the steady action of courts that wills are sacred things; that the privilege secured by the law to the citizen to dispose of his property by will as to him shall seem just, is estimated by the tribunals amongst the dearest of social rights, assaults on such instruments will be made with caution, and controversies between relatives averted, which would, if entered into, lead to separations and estrangements alike detrimental to their interests and subversion of their happiness. Hence it has ever been a sentiment, under which I have uniformly acted, that he who comes into a court of justice seeking to nullify a last will and testament, executed with all the forms and proved in the manner required by law, has on hand a most serious task; and that courts and juries, in determining between litigant parties in such controversies, have a duty to perform peculiarly calling for intelligence, deliberation, disciplined judgment and dispassionate decisions."

And now, February 3d, 1885, the appeal from the Register is dismissed and the demand for an issue refused.

The appellants thereupon took this appeal, assigning for error this decree of the court.

*T. B. Metzger* and *John Rupp*, for appellants.—Under the

4 AMERMAN.—2

Act of March 15th, 1832, § 41, P. L., 146, an issue as to disputed facts arising before the Register's court is a matter of right where the evidence would sustain a verdict: Gibson's Estate, 11 W. N. C., 355; Harrison's Appeal, 4 Out., 458.

The awarding of an issue, *devisavit vel non,* by the Orphans' Court is of right upon the request of either party where the fact arising and in dispute is substantial and material to the inquiry, unless the whole evidence of the fact alleged is so doubtful and unsatisfactory that a verdict against the validity of the will would not be allowed to stand: Schwilke's Appeal, 4 Out., 628; De Haven's Appeal, 25 P. F. S., 337; Graham's Appeal, 11 P. F. S., 43.

When the evidence of testamentary capacity is contradictory, an issue must be awarded: Colgate's Estate, 5 W. N. C., 170.

It is the duty of the court to determine the sufficiency of the evidence of testamentary capacity: Cauffman *et al. v.* Long, 1 Norris, 72; Shaver *v.* McCarthy, 3 Eastern Reporter, 12.

Where there is any evidence which alone would justify an inference of the disputed facts, it must go to the jury, no matter how strong or persuasive the countervailing proof: First National Bank of Easton *v.* Wirebach's Executor, 10 Out., 37; Howard Express Co. *v.* Wile, 14 P. F. S., 201.

*Edward Harvey,* for appellees.—All the cases require that before an issue is granted there should be a material fact in dispute: Harrison's Appeal, 100 Pa. St., 458. And the fact disputed must be a material fact in controversy; its materiality must be judicially determined, in the first instance, by the court: Bradford's Will, 1 Parson's Eq. Cas., 153. "A mere naked allegation," says AGNEW, J., "without evidence, or against the evidence, cannot create a dispute within the meaning of the law:" DeHaven's Appeal, 75 Pa. St., 341; Graham's Appeal, 61 Pa. St., 43; Wykoff's Appeal, 15 Pa. St., 281.

What, then, is considered before granting or refusing an issue? Is the evidence of both contestants and proponents considered? "After careful examination," says ELWELL, P. J., "aided by the light of the numerous cases cited upon the argument, and others, I have had no difficulty in reaching the conclusion that the court not only has the power, but is charged with the duty to ascertain, from evidence adduced by the parties, what material facts are in dispute, and to confine the issue, if one is granted, to the trial of such facts:" Harrison's Appeal, 100 Pa. St., 462. Again, in Schwelke's Appeal, 100 Pa. St., 631, MERCUR, J., says: "The issue is of right,

under the 41st section cited, when the fact arising, and in dispute, is substantial, unless the whole evidence of the fact alleged be so doubtful and unsatisfactory that a verdict against the validity of the will should not be permitted to stand." In Wainwright's Appeal, 89 Pa. St., 220–6, SHARSWOOD, C. J., says: "If, upon the whole evidence, such a verdict ought not to be allowed to stand, an issue ought not to be awarded." And in Combs's and Hankinson's Appeal, 105 Pa. St., 156, this court decided that an issue, *devisavit vel non*, will not be granted, if, upon the whole evidence on both sides, a verdict against the will would not be permitted to stand. The court must judge of the sufficiency of all the evidence; it is error to submit it to a jury, unless it be judicially determined that it is sufficient to support a verdict against the will: Wilson *v.* Mitchell, 101 Pa. St., 495. In the following cases all of the evidence submitted by contestants and proponents was considered: DeHaven's Appeal, 75 Pa. St., 337; Graham's Appeal, 61 Pa. St., 43; Harrison's Appeal, 100 Id., 462; Combs's and Hankinson's Appeal, 105 Id., 156; DePuys Estate, 1 W. N. C., 212; Frowert's Appeal, 2 Id., 588; Gibson's Estate, 11 Id., 355; Hopple's Estate, 7 Id., 523; Burden's Estate, 11 Id., 138; Palmer's Estate, 5 Id., 542; Rankin's Estate, 4 Id., 203; Eddy's Estate, 14 Id., 551; Freeman's Estate, 39 Leg. Int., 208; Neill's Estate, 37 Leg. Int., 39; Wainwright's Appeal, 89 Pa. St., 220; Boyer's Will, 13 Phila. Rep., 258.

In regard to issues, *devisavit vel non*, it is the determination of the court to discourage vexatious or ill-founded contests, and to carry out the expressed intentions of the testator. The evidence must be such, that if an issue be granted, and a jury should find a verdict against the will, this court, if sitting as a court of law, would be satisfied that the finding was in accordance with the evidence, or the weight of the evidence, and refuse to disturb the verdict: Neill's Estate, 37 Leg. Int., 39.

It is the duty of the court to determine the sufficiency of evidence of testamentary incapacity, and it is error to submit the question to a jury unless it be sufficient: Cauffman *v.* Long, 82 Pa. St., 72.

"The weight of their testimony, as opposed to that of the appellants, if submitted to a jury, would forbid the court to sustain a verdict against the will. And if the question were susceptible of a doubt, the inherent justice of the provision of the will would tend to solve the doubt in favor of the proponents." Per ASHMAN, J.: Williams's Estate, 37 Leg. Int., 15.

An issue to test the validity of a will should not be granted when the evidence, upon which the application for an issue

rests, is so insufficient that the court, in the exercise of a sound legal discretion, would not sustain a verdict thereon : Eddy's Appeal, 2 Eastern Reporter, 585: The case was decided by the Supreme Court of Pennsylvania, October 5th, 1885.

The same rule was applied by GREEN, J., in Houser *v.* Lightner, MSS., decided October 6th, 1884.

The test as to granting an issue is this : Should a verdict be rendered against the will on the evidence submitted, could the court enter judgment? Hoge's Will, 2 Brewster R., 451 ; DePuy's Estate, 1 W. N. C., 212 ; Burden's Will, 14 Phila. R., 332.

An application for an issue of fact is properly refused when the applicant could not exhibit a condition of affairs under which he could recover, even if all the facts, alleged by him to be true, were found in his favor: Martin's Appeal, 97 Pa. St., 85.

Mr. Justice STERRETT delivered the opinion of the court, October 4th, 1886.

It is contended by appellants that according to the true intent and meaning of the 41st section of the Act March 15th, 1832, there was " a dispute " before the Orphans' Court " upon a matter of fact," viz. : Whether the deceased, George Probst, was of sound and disposing mind, memory and understanding at the time he signed a certain paper, purporting to be his last will and testament; and that it thereupon became the duty of the court to " direct a precept for an issue to the Court of Common Pleas of the county for the trial " of said disputed fact.

It cannot, of course, be doubted that the matter of fact alleged to be in dispute is material. The sole question is whether, upon the testimony presented by the respective parties, a serious dispute has arisen as to the testamentary capacity of the alleged testator; such a dispute as should be submitted to and passed upon by a jury. In rightly determining that question there is only one safe and reliable test. If the testimony is such that after a fair and impartial trial, resulting in a verdict against the proponents of the alleged will, the trial judge, after a careful review of all the testimony, would feel constrained to set aside the verdict as contrary to the manifest weight of the evidence, it cannot be said that a dispute, within the meaning of the Act, has arisen. On the other hand, if the state of the evidence is such that the judge would not feel constrained to set aside the verdict, the dispute should be considered substantial, and an issue to determine it should be directed. This simple and only safe test is supported alike by reason and authority: Graham's Appeal, 61 Pa. St., 43

[Vowinckel v. Patterson.]

Cozzen's Will, Id., 196; DeHaven Appeal, 75 Id., 337; Harrison's Appeal, 100 Id., 458; Swilke's Appeal, Id., 628. In the last cited case, the present chief justice says: "The issue is of right, under the 41st section, when the fact arising and in dispute is substantial and material to the inquiry, unless the whole evidence of the fact alleged be so doubtful and unsatisfactory, that a verdict against the validity of the will should not be permitted to stand." In DeHaven's Appeal, *supra*, it is said we ought not to reverse a decree refusing an issue if the Court of Common Pleas, after trial, would have been bound to set aside a verdict against the will as contrary to the manifest weight of the evidence. "Of what use would it be if the case can be decided but one way."

Without pursuing the subject further or referring specifically to the evidence bearing on either side of the question, a careful consideration of the testimony returned with the record, and application thereto of the rule above stated, has led us to the conclusion that a precept for an issue to the Court of Common Pleas should have been directed.

Decree reversed at the costs of appellees, and it is now adjudged and decreed that a precept for an issue to the Court of Common Pleas of Lehigh county, as prayed for by appellants, be and the same is hereby directed.