## Kane's Estate.

Argued May 24, 1933. Before FRAZER, C. J., SIMP-SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*J. DeHaven Ledward,* of *Ledward & Kinkson,* with him *Geary & Rankin,* for appellants.

*John B. Hannum, Jr.,* and *D. Malcolm Hodge,* of *Hannum, Hunter, Hannum & Hodge,* for appellees.

OPINION BY MR. JUSTICE LINN, September 25, 1933:

This appeal complains of the denial of probate, on the ground of forgery, by the substitution of one page and the alteration of another, of an instrument bearing decedent's signature, and of the refusal of an issue devisavit vel non.

Eliza Leiper Kane, domiciled in Delaware County, Pennsylvania, died April 29, 1929, without issue. She was survived by her husband, from whom she had been

separated six years. Her next of kin were three brothers and a sister. In her safe deposit box, in a trust company in Chester, a holographic will (quoted below)\* was found. It was admitted to probate August 10, 1929. Letters of administration c. t. a. were granted to George G. Leiper, decedent's eldest brother. October 28, 1929, Mrs. Davis and her sister appealed from the probate, and also offered for probate an alleged will of later date, that now in question, under which they would take the entire estate. This paper was typewritten, dated January 30, 1929, witnessed by a sister of the beneficiaries, Kathryn C. Page, St. Petersburg, Florida, and by Mary A. Smith, Eustis, Florida. The first paragraph contained a direction to pay debts and funeral expenses; the second, reciting her husband's desertion and failure to support, provided that he should not receive any of her property; the third excluded her brothers and sisters, because "all of them have treated me with injustice and cruelty since the death of my beloved Mother." The fourth paragraph was as follows: "I give, devise and bequeath to my two beloved friends, E. Irene C. Davis and Ray A. Craven, share and share alike, all of

---

\* "June 1, 1925. I am about starting on Auto trip to Annapolis and direct that in case of death, my farm be given to the Chester Y. W. C. A. for the use of my dear girls, hoping it will be so managed as to allow Boy Scouts and others to have the privilege of enjoying it under strict and proper direction by the Board of the Y. W. C. A. To Irene Davis $500.00 To Ray Craven $500.00 George Brown [Bowen?] $500.00 Ruth Taylor, Portland, Oregon $100.00 Kitty Nothnagle $100.00 Grace Freihofer, Germantown $100.00 May Jones, Germantown or N. Carolina $100.00 Mary Dougherty wife of Philip $100.00 Portrait of Wm. Irvine to Leiper Black Diploma of Judge Leiper—James Carey Painting of Eddie Ocheltree by Sir David Wilkie to Charles Carey Mary Carey, Silver Cream Pitcher—Grandmother Leiper Pearls in Bank Box, Leonora Fayssons Haddon, New Orleans Possessions to be sold at auction—and balance to Y. W. C. A. To Elizabeth Zeiss $500.00 Elizabeth Leiper Kane Ralph Fitz Simon $100.00 E. L. Kane." The beneficiaries named Black, Carey and Haddon were relatives of testatrix.

my property, real, personal or mixed of whatever kind or nature or wheresoever situate, absolutely in fee. These two friends have been as daughters to me; have advanced me sums of money from time to time for a period of over twenty years and when I was in need; they nursed me in sickness and gave me home and love and affection." Mrs. Davis was appointed executrix. By the holographic will, Mrs. Davis and Miss Craven each received five hundred dollars.

On proponents' petition, probate of the will on which letters had been granted was opened and the proceedings were certified into the orphans' court, where evidence was taken to determine whether the second instrument should be admitted to probate. When the testimony was about completed, proponents filed their petition for an issue devisavit vel non.

The applicable rule of law was thus stated in Fleming's Est., 265 Pa. 399, 109 A. 265: "A dispute as to the facts such as to require the granting of an issue under the Act of March 15, 1832, P. L. 146, 4 Purdon (13th ed.), page 4088, [Section 21 (b), 1917, P. L. 382], must be a substantial dispute and the evidence, considered as a whole, must be such as would sustain a verdict in favor of the party praying for the issue. Such party is usually the contestant, but the rule is the same as to either side, and where the trial judge, after a careful review of all the testimony, would feel constrained to set aside a verdict, if in favor of one side, as contrary to the manifest weight of the evidence, the issue should be refused. See Conway's Est., 257 Pa. 314, 101 A. 652; Roup's Est., 236 Pa. 31, 84 A. 592; Fuller's Est., 222 Pa. 182, 70 A. 1005; Knauss's App., 114 Pa. 10, 6 A. 394; Harrison's App., 100 Pa. 458." See also Tetlow's Est., 269 Pa. 486, 112 A. 758; Wagner's Est., 289 Pa. 361, 137 A. 616; Mark's Estate, 298 Pa. 285, 148 A. 297; Minnig's Est., 300 Pa. 435, 150 A. 626; Roney's Est., 309 Pa. 309, 164 A. 55.

Decedent's residence was on her farm at Knowlton in a house which she had built.* She was sixty-eight years of age, quite feeble, afflicted with diabetes, and, in February, 1929, spent some time in a hospital. From March 1, 1929, to March 22d, she lived with appellants. She then went to her own home, where, as Mrs. Davis testified, she "took a terrible cold" and "then she returned to me [Mrs. Davis] after ten days." From then until her death, April 29th, she remained with appellants at their home in Ridley Park, Delaware County.

May 5, 1929, decedent's brother, her nephew, two lawyers, and Mrs. Davis went to the residence at Knowlton to search for the key to decedent's safe deposit box. They found, as the learned judge below stated, that "Everything in the rooms was in great confusion and they searched through the said rooms, through the house, from one to two hours and were unable to find any key or anything else, so far as appears, of any value. Before leaving, at the suggestion of James L. Rankin, Esquire, and agreed to by Mr. Hodge and the Leipers [all present] a woman by the name of Mary Brown, who resided in the neighborhood, was placed in charge of the house and received private instructions from James L. Rankin, Esquire, to make further search and if she found anything of value to bring it to him together with any mail that should be received. Mary Brown testified that she was cleaning up the house and went to the third story to take

---

* The evidence is that the house was much larger than her necessities required. Friends testified that, from time to time, she stated that she wished there to "establish a home for others"; that she said "I think I will leave my place to the Y. W. C. A." (as was done by the will admitted to probate). She repeated this as late as September, 1928. While the house was building, Frank Ogden, who was working on it, suggested to her that she should build a bungalow; she replied, "No, I want to build a big house"; when she "was done with it, it went to a charitable orphanage." She said it should be known "as Chateau Faysoux" (a family name) and that "a bronze plaque was to be made, and she showed me [Bowen] the place on the wall where it was to be fastened."

some old newspapers and other stuff and when she arrived in the third story room she noticed some evidence of mice having been there and which she followed up and found an old hamper in the back part of the room—the said room being littered with furniture and other stuff —in an old trunk which showed evidence of the mice having been in that. There were three or four comfortables in the trunk which she took out and searched down to the bottom of the trunk where she saw the evidence of mice and in the search she discovered some papers and two boxes; one a tin box which was locked and had no key. She at once called to her husband 'see look what I found' and he told her to put it back and leave it there until she had some mail to take to Chester. She left the said box in this trunk until June 4, 1929, when she took it to Chester and delivered it to James L. Rankin, Esquire, together with some papers that she found."

The tin box remained in Mr. Rankin's possession until October, 1929, when it was pried open in the presence of Mr. Hodge, of counsel for the next of kin. In it was found the alleged will, some receipts, letters, and a stock certificate (par value, $4,000) later appraised at no value. This instrument was then offered for probate, as stated above (Sebik's Est., 300 Pa. 45, 150 A. 101). It consisted of two sheets of paper and a backer; the first sheet contained all the dispositive provisions; only the testimonium clause, with decedent's signature, and the attestation clause, with the signatures and addresses of the witnesses, were on the second sheet. When produced by proponents, these two sheets were bound together by a backer of gray paper, fastened at the top by three eyelets, designated in the evidence as Bates Eyelets. The typewriter, a portable machine, on which the document was written, was produced in court. A witness, McGinnis, testified that, at Mrs. Kane's direction, and in her presence, he wrote the will on the typewriter in the office of a real estate agent, with whom he was

associated from time to time on a commission basis, in West Philadelphia, and accompanied her to the banking department of the Real Estate Land Title and Trust Company, in Philadelphia, where she met the two subscribing witnesses; that he produced the paper and that she executed it and asked the subscribing witnesses to attest her signature; that she put the paper in her handbag and left with both the witnesses. For these services, he said, he received two dollars.* He stated that he heard no more of the matter until he read in a Philadelphia newspaper an account of a contest concerning Mrs. Kane's will, which led him to write to Mrs. Davis stating that he had drawn a will for Mrs. Kane, etc. He testified that the typewriter belonged to him and, from the time of its purchase, had not been out of his possession. He kept it at his home, "occasionally" taking it to the real estate office. Testifying in September, 1930, he stated, at one point in his testimony, that he had purchased the typewriter, secondhand, from an itinerant vendor, who came to his residence for the purpose of making the sale, two years before (which would date the purchase in September, 1928); at another point in the record, he said that he purchased it in December, 1928. The difference in time is of possible consequence in connection with the use of the same machine for the purpose of inserting the word "trustee" in the Herring deed in September, 1928, a fact to be referred to later. While on the subject of this typewriter, a related piece of significant evidence may conveniently be mentioned. A young man named Joe Mays did chores about decedent's farm and drove her automobile. He produced a

---

* A scrivener, who understood his business, would of course never have prepared, or permitted to be executed, a paper so easily altered by a change in the first page, as the one in question. McGinnis testified that he acquired his "knowledge of writing wills" in Milwaukee, assisting "an expert in forged and questioned handwriting. . . . . . I wrote many a will on the typewriter or copies of them."

letter signed "A friend" (Quoted below*), mailed and postmarked at Chester, January 15, 1929, two weeks before the date of the alleged will, addressed to him at Knowlton, Pa., "care Mrs. Thos. A. Kane." An expert witness, called on behalf of appellants, agreed, with evidence offered by the next of kin, that this letter, and the envelope in which it was mailed, were written on the typewriting machine produced by McGinnis. Hoffman, mentioned in the letter, was an acquaintance of Mays, and known to be so by appellants. We have not been able to find in the record that McGinnis was examined about the letter. Appellees suggest that only persons interested in establishing this will could profit by getting Mays out of the neighborhood in order to avoid the effect of his evidence. Mays testified that he showed the letter to Mrs. Kane, who said, among other things, "that she suspected somebody up at Ridley Park, either Mrs. Davis or Miss Ray Craven"; because "they were afraid of me. Mrs. Kane said they couldn't handle me"; that "they said they wanted to get me to go away from the old lady." He also testified that Mrs. Davis told him he "ought to get a job"; that Miss Craven said "I ought to get away from that old woman. I am not getting anything. I ought to go to work and stay away from her. ......" Hoffman, who was present, corroborated Mays as to these statements, said to have been made by appellants; Miss Craven denied making them, while Mrs. Davis said she did not remember making such a statement. The value of Miss Craven's testimony concerning Mays is much impaired by her evidence; she accused

---

* "Friend Joe—Say Joe, there is a plot to get rid of you. You know them Ku Kluxers, well they are planning to take you away. I hear there has been stealing around your place and you are blamed. So Joe get out of this country as fast as you can. I am your friend. I can't now tell you who I am. Don't come back until you hear from me, for these fellows will follow you for revenge. You are watched. They say you are living with the old woman on the hill. Leave your address with Hoffman. I will get it and warn you from time to time. A Friend."

him of theft from her, yet, in cross-examination, identified a picture postcard which she admitted sending to him from Florida, in 1930, stating: "Had hoped you would be with us this winter—seems to be our fate not to be able to reach you when we need you—you have missed a treat by not being with us. Perhaps you can go to Canada with us in June." She explained, that she meant to employ him as chauffeur. Mays, from time to time, drove Mrs. Kane to and from her Knowlton residence to appellants' residence at Ridley Park. He testified that on one of these trips she informed him that "there was something missing out of her hand bag"; "she said there was some paper, Philadelphia letters, checks and the keys and other things that she had." She thought they had been taken by "somebody in the Davis's." Mays left the community March 4, 1929, taking employment at a distance, and did not return until May 19, 1929. He then went, accompanied by Hoffman, mentioned above, to the Davis residence to see Mrs. Kane and found there only Mrs. Smith (one of the attesting witnesses) who informed him that Mrs. Kane died April 29th.

Mrs. Page, one of the subscribing witnesses, a sister of appellants, was interested in the sale of Florida real estate. During September, 1928, she caused a deed, called the Herring deed, for the sale of land in Florida, to be drawn in Chester to be executed by her. She testified that she signed it in Philadelphia and sent it to a real estate agent, named Allen, in Jacksonville, Florida, to ascertain whether she held title as trustee, and, if she did, to make the deed read accordingly. The deed, offered in evidence, shows that the word "trustee" was added to her name, with a typewriting machine having a different style of letter from that in which the deed had originally been written. Allen testified that he had that word inserted in Florida at her request.*

---

* Allen first testified that he saw the word "trustee" added by his stenographer, a Miss MacMillan; then, that Miss MacMillan was

540

The evidence shows that the word "trustee," so inserted, and the endorsement on the deed, were written on the same typewriting machine on which McGinnis said he wrote the alleged will, and on which the anonymous letter to Mays was written. There is evidence that Mrs. Page's husband possessed and operated a portable typewriter, described by witnesses who saw it, as like the one in court, which McGinnis said he used. Unfortunately, perhaps, for the more complete elucidation of the transaction, Mr. Page was not interrogated about this or other related matters. Did this typewriter belong to him, in spite of what McGinnis said? Had it belonged to him? Where, and by whom was it used in completing the Herring deed? What, if anything, did he know about the preparation of the paper offered for probate or of the anonymous letter to Mays?

The evidence supports the finding that, out of the three eyelets used to bind the instrument, the middle eyelet had been removed and had been again replaced, with slight damage, readily observable, to the paper. On behalf of the next of kin, it is suggested that a document bearing decedent's signature, and originally bound with only one eyelet, was altered by the removal of the first page and the substitution of another first page as it now appears, and the addition of the attestation clause on the second page, followed by rebinding with three eye-

---

the stenographer of one Gibbons, a lawyer with an office in 206-208 Graham Building, where she added the word, and made the endorsement on the deed. Several months after Allen testified, appellee called Mrs. Florence Watson of Jacksonville. She testified that she was Gibbons's stenographer at the time described by Allen; that Gibbons had no stenographer named MacMillan; that his office was not 206 Graham Building, but 105 Graham Building; that Gibbons's typewriter was equipped with pica and not with elite type. The word "trustee" was written on a machine with elite type. Subsequently, the typewriting machine, used by Mrs. Watson, in Gibbons's office, was produced in court, fully identified. Allen's testimony, in the important respect indicated, cannot be accepted as in accord with the facts.

lets, two of which had not been used originally, the middle one filling, and somewhat enlarging, the puncture made by the first binding. It is conceded that decedent's signature is genuine. Both subscribing witnesses testified that they saw her sign her name and attested her signature at her request; in the orphans' court, Mrs. Page testified several times; as the other witness, Mrs. Smith, was a nonresident who declined to appear in the orphans' court on the ground of ill health, after the probate of the will was opened, evidence of her signature was offered. There is evidence that prior to Mrs. Kane's death,. Mrs. Smith from time to time visited appellants at Ridley Park.

On this record we find no reason to differ from the conclusion, implied in the decision of the learned chancellor, that the portable typewriting machine, in evidence, destroys proponents' case. While McGinnis was on the stand, he made a copy of the alleged will, and other matter submitted to him, on the machine. This copy of the will has been submitted to us; the physical characteristics described by the trial judge are apparent. He said: "Then again the writing that McGinnis made in the test at court showed a heavy touch. If the alleged will was written, as he says it was, by him, the typewriter would make burs on the back of the paper. An examination of the back of the alleged will shows no burs and shows no evidence of any heavy touch. In the typewriting that he did in Court with reference to the verse from Nehemiah, where the numeral one was used, he made it with the lower case (1) ell. Therefore, in my opinion he was not the one that wrote the alleged will." On the same general subject he said: "The typewriter which was produced by McGinnis, on which he said the alleged will was written, has no character for the numeral one, in the keyboard. The type was elite. In McGinnis's letter to Mrs. Davis, which he says was written on this typewriter on July 29, 1930, the numeral one is made by the lower case (1) ell, and it occurs four times.

"In the letter of McGinnis to Eliza Leiper Kane, the numeral one is made by the lower case (1) ell and it occurs at least twice. In the deed and in the testimonial clause of the alleged will, the numeral one is made by the capital (I) eye. In the Iona Herring deed the numeral one on the back of the deed is made by the capital (I) eye. This deed was written by a young woman by the name of Dougherty at the instance of Mrs. Page and it gives Mrs. Page's residence as of Eustis. But this young woman did not write the endorsement on the deed.

"On this machine produced by McGinnis the type was elite and there was no numeral one on the keyboard. The alleged will and the Ku Klux letter [the letter to Mays] and the endorsement on the back of the Herring deed and also the word 'trustee' on the inside of the deed are of elite type, and were, as the evidence shows, all written on this machine. I, therefore, conclude that the alleged will, the Ku Klux letter and the endorsement on the deed, etc., were written by some person other than McGinnis."

It is unnecessary to discuss a number of other elements, considered below, among them, the evidence that the holographic will of 1925 was in accord with the repeated declarations of testatrix of an intention to benefit a charity; that prized family possessions were bequeathed to relatives appropriately chosen in each case to receive the particular gift; considerations arising from the evidence concerning Mays and Hoffman and their relations with proponents; the receipt obtained for money expended in repairing the typewriter; and other serious contradictions in testimony offered on behalf of appellants.

In their brief, appellants made no specific reference to, and give us no aid in dealing with, the obvious and serious difficulties arising out of the alleged use of the typewriter by McGinnis, if it was used by him, in its relation to the documents referred to. We can only place one interpretation on their silence on this subject. They

assert that the court erred in refusing probate on "the opinion of a handwriting expert" (McWilliams's Est., 259 Pa. 526, 103 A. 365), which, they say, is only of corroborative value. But that is not what occurred. The basis of the decision is largely dependent on observation of physical facts, many of them not disputable, not on comparison of handwriting. Concerning many important elements, the experts on both sides agree. We do not regard it essential, in the circumstances disclosed, to fix the exact time when the dispositive parts of the alleged will, or the attestation clause, were written, one expert claiming that his observation led him to conclude that they were written four or five months after the testimonium clause, while appellants' expert thought that the entire document was written at the same time.

On this record we should not be justified, by the precedents cited above, in differing from the learned chancellor in the ultimate conclusion that, considering the evidence as a whole, if a jury rendered a verdict sustaining the will, he would be compelled to set it aside.

Decree affirmed at appellants' costs.