Masciantonio Will.

364

Argued January 7, 1958. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, JONES and COHEN, JJ.

*Francis T. Dennis,* with him *Walter E. Alessandroni,* for appellants.

*Richard S. Lowe,* with him *James R. Caiola, Bernard V. DiGiacomo* and *DiGiacomo & Lowe,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, April 21, 1958:

Decedent, aged 69 years and a resident of Conshohocken, Pa., died July 21st, 1955 in the Sacred Heart

Hospital in Norristown, Pa. His immediate survivors —all residents of Italy—were his widow, Rosa Masciantonio, and nine nephews and nieces.

On August 2, 1955, a written instrument purporting to be the decedent's last will was admitted to probate by the Register of Wills of Montgomery County and letters testamentary were issued to the executor named therein, the Montgomery Norristown Bank and Trust Company. From the decree of probate the decedent's widow appealed. After a hearing[1] the Orphans' Court of Montgomery County sustained the Register's action and these appeals were taken.

The decedent came to the United States from Italy in 1905, leaving his wife in that country.[2] Although decedent and his wife never lived together again the record reveals that decedent over many years, with the exception of the war years, forwarded money from time to time to his wife who lived on a farm which decedent owned in Italy. The decedent's original intention may have been to return to Italy, but, after World War I, he continually hoped to bring his wife to the United States, an expectation never realized because of his failure to become a U. S. citizen.

Decedent always resided in Conshohocken, for about 24 years with the D'Allesandro family—the first Mrs. D'Allesandro having been a relative—and the rest of the time alone. A long time employee of the Allen Wood Steel Company, the record portrays decedent as

---

[1] Both proponents and contestant waived their rights to a trial by jury and the court heard the appeal without a jury.

[2] The widow, who came to this country subsequent to decedent's death, testified that she married decedent in Civatella, Chieti, Italy, in November 1904 and produced their marriage certificate. The parties lived together for nine months before decedent came to this country. A male child, born of this marriage, died when forty (40) days old on March 13, 1906.

a frugal, exceedingly industrious and somewhat retiring person. Approximately three weeks prior to July 10th, 1955 he became ill. On July 10th, 1955 he was admitted to the hospital where he remained until his death on July 21st, 1955. The cause of death was carcinoma of the liver attended with hepatitis, inflammation of the liver and jaundice.

The will, the validity of which is attacked, appears on a typewritten instrument, dated July 20th, 1955, executed by decedent by mark and bearing the signatures of two subscribing witnesses, the scrivener and the sole residuary legatee. Proponents claim that this will was executed at approximately 4 P.M. on July 20th, 1955—about seventeen (17) hours prior to decedent's death.

The alleged will contains: (1) a direction that the decedent's debts and funeral expenses be paid; (2) specific devises of four separate pieces of realty, one to each of four named persons described as "nephews" and "nieces";[3] (3) a bequest of $3,000 to a Conshohocken church; (4) a gift of the entire residuary estate to one Rose Benedict;[4] (5) a direction that each devisee and legatee pay his or her proportionate share of the taxes; (6) a direction that, even though the decedent gave under the will nothing to his wife, yet, in the event that the wife should successfully assert a right against the estate,[5] the shares of each legatee and devisee should be proportionately diminished; (7) the appointment of the Montgomery Norristown Bank and Trust Company as executor.

---

[3] The devisees were actually not "nephews" or "nieces", but "grandnephews" and "grandnieces".

[4] Decedent's first cousin, once removed.

[5] The widow, for some unaccountable reason, never elected to take against the will and allowed the time for such election to pass.

A three-fold attack is made on this alleged will: that at the time of its execution decedent lacked testamentary capacity, that the will was procured by undue influence and fraud, and that it was not legally executed in that one of the two witnesses to decedent's signature by mark, the sole residuary legatee, was incompetent to act as such witness.

In reviewing this decree of the court below we are mindful that the findings of an Orphans' Court judge, who heard the testimony without a jury, are entitled to the weight of a jury's verdict and are controlling upon us and that its decree should not be reversed unless it appears that the court has abused its discretion: *Williams v. McCarroll,* 374 Pa. 281, 298, 97 A. 2d 14. See also: *Kerr v. O'Donovan,* 389 Pa. 614, 629, 134 A. 2d 213; *Farmer Will,* 385 Pa. 486, 487, 123 A. 2d 630. However, we are also mindful that if it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence the court's findings may be set aside: *Mohler's Estate,* 343 Pa. 299, 305, 22 A. 2d 680. The test is not whether we, the appellate court, would have reached the same result had we been acting as the hearing judge who saw and heard the witness, " 'but rather whether a judicial mind, on due consideration of the evidence, as a whole, could reasonably have reached the conclusion of the chancellor' ": *Shuey et al., Exrs. v. Shuey et al.,* 340 Pa. 27, 32, 16 A. 2d 4.

The determination of the propriety of the instant decree necessitates our review of the entire record.

Proponents offered in evidence the record of probate and then rested. Upon contestant was then imposed the "duty to come forward with evidence": *Kerr v. O'Donovan,* 389 Pa. 614, 623, supra, and cases therein cited. In performance of this duty the contestant

produced twelve witnesses:[6] decedent's two attending physicians, two nurses, his widow, three relatives and four friends.

Contestant's evidence may be thus summarized:

(1) *Margaret D'Allesandro*—stepmother of the four specific devisees—had known decedent for approximately 20 years, during 15 years of which he lived in the D'Allesandro home while she lived there. At decedent's request, on or about July 10th, 1955 she called Dr. Rappaport, arranged for decedent's hospitalization and drove decedent to the hospital. Prior to decedent's departure for the hospital he gave her approximately $400 for the payment of taxes on his realty, at least part of which was applied to that purpose. During the first four or five days of decedent's hospitalization, she conversed with him, either by actual visitation to him or on the telephone, although after July 15th he did not answer the telephone. During her last telephone conversation with decedent he complained he was being "pestered" about making a will. On July 19th she remained at the hospital from 1:30 P.M. to 6 P.M.; at various times that afternoon Rose Bene-

---

[6] The testimony of four of these witnesses, Rosa Masciantonio, Francesco DiLullo, Amato D'Amico and Adamo DiGuglielmo, was for the most part irrelevant on the issues of testamentary incapacity and undue influence. Rosa Masciantonio testified concerning the relationship between decedent and herself over many years, the receipt of money from him and the fact that she received the proceeds of a life insurance policy—$3,000—on her husband's life in which policy she was the named beneficiary. DiLullo testified that at decedent's death he had $1624.59 on deposit in the Bank of Rome and owned realty in Italy valued at $3,600. D'Amico verified the fact that decedent sent money to his wife and tried to get her into this country. DiGuglielmo on a visit to Italy in 1934 transmitted money from decedent to his wife and, on several occasions, went to a Philadelphia bank with decedent for the purpose of sending funds to decedent's wife.

dict, Michael Masciantonio (Rose Benedict's father), Peter Masciantonio and Joseph Gennaro arrived. They all left the hospital together. While all were in the hospital Dr. Carfagno informed them that decedent was then critically ill. While they were conversing in the hospital corridor a visiting priest came by; in their presence Rose Benedict spoke to the priest, stating that the decedent did not have a will, and the priest said that "someone ought to get it made". The next day—July 20th—when she visited decedent he was "kind of sleeping steadily". Prior to his departure for the hospital decedent told her that he was going to straighten out his affairs and that "his wife won't be poor anymore". This witness testified that Rose Benedict, residuary legatee, never visited decedent at his home.

(2) *Peter Masciantonio*—decedent's first cousin, once removed, and a fellow worker—when he visited decedent on July 13th, found his condition seemingly good, although he was jaundiced. On July 19th decedent was asleep and the witness was unable to secure any response from him, except a shake of the head. He described the difficult time he had in putting pajamas on decedent on that date because of the latter's inability to cooperate. He corroborated Mrs. D'Allesandro's testimony concerning the conversation in the hospital corridor between the priest and Rose Benedict. From his observations on July 19th decedent was then unable to make a will. He denied that Attorney DiGiacomo, the scrivener, was at the hospital at 5:45 P.M. on July 19th.

(3) *Laura Ambirg*—decedent's friend of almost 40 years—stated that, in April or May, 1955, when decedent was contemplating the purchase of another piece of realty, she asked him what would happen if he died and decedent replied "I guess my wife take it".

(4) *Joseph Gennaro*—decedent's friend and neighbor—visited the decedent on July 19th and found him mumbling and too ill for any conversation.

(5) *Marion Manfredi*—nurse on duty from 7 A.M. to 3 P.M.—testified that decedent was fed intravenously the last few days of his life, that on July 18th he was lethargic and on July 19th and 20th he was "dozing at long intervals".

(6) *Caroline Monastero*—nurse on duty from 11 P.M. to 7 A.M.—stated that while she was on duty decedent was apparently always sleeping.

Contestant's principal testimony came from *Dr. Rappaport,* the attending physician, and *Dr. Carfagno,* a consulting specialist in internal medicine, both admittedly qualified. Dr. Rappaport—to whom decedent was then unknown—in response to a call had decedent admitted to the hospital on July 10th, 1955. Because of decedent's physical condition, the doctor had great difficulty in securing from him a complete history. He did learn, however, that decedent, although he had continued to work, had been feeling quite ill for three weeks. Even though the decedent was jaundiced and apparently very ill, it was the opinion of this doctor that *then* decedent could recognize people and knew the extent of his property. From the date of his admission on July 10th until the date of his death on July 21st Dr. Rappaport saw decedent at least once, sometimes twice, daily. On July 17th Dr. Rappaport called in Dr. Carfagno for consultation. On the date of the alleged will—July 20th—he visited the decedent on two occasions, at 11 A.M. and 5 P.M.—*five hours before and one hour subsequent to the time the will allegedly was made.* On both occasions decedent was stuporous,[7] dying, too weak to talk and, on the occasion

---

[7] The hospital records corroborate the doctor's testimony that decedent was stuporous.

of the second visit, decedent was semi-comatose, but not completely unconscious. Dr. Rappaport stated that the decedent could not have had a lucid interval and did not have the mental capacity to express himself. From the *observations* made by Dr. Rappaport of the decedent on these two occasions on July 20th, 1955 he stated that the decedent did not have the mind, the memory nor the understanding to be able to dispose of his property by will and was "absolutely not in a condition to give such information". Dr. Rappaport, from his *observations,* further stated that decedent could not have made a will on July 17th, July 18th, or July 19th.

Dr. Carfagno visited decedent on July 20th between 1:30 P.M. and 2:00 P.M.—*approximately two hours prior to the time the will is alleged to have been made.* From his *observations* of decedent the doctor stated that on this occasion the decedent was either lethargic or stuporous, probably the latter, and was not able, physically or mentally, to make a will. Based upon his *observations,* Dr. Carfagno testified that it was "possible, but not likely" that decedent could have been conscious prior to his visit, that it was "possible, but not very probable" that decedent could have recognized visitors at 6 P.M. that day and that decedent was not "lucid" when he saw him on July 20th.

When contestant rested, the proponents produced ten witnesses, *all of whom, with possibly one exception,*[8] *had an interest in the outcome of this litigation.*

(1) *Peter D'Allesandro*—decedent's grandnephew and a specific devisee—until his marriage in 1942 lived in the same house with the decedent.[9] Within two

---

[8] Marta Giondonato.

[9] This was likewise true of Ann M. Bernardini, Mary E. Donato and Nicholas D'Allesandro, three of proponents' witnesses. As the court below stated: "For at least a twenty-four year period

years of his death decedent told him that upon his death he would leave him the property situated at 6th and Maple Streets, Conshohocken. When he visited decedent at approximately 7:15 P.M. on July 20th Rose Benedict and another woman were present and, although decedent "didn't look too good", he was sitting up in bed. Although this witness testified to certain responsive answers made by decedent to him, yet he continually modified and qualified such testimony by saying "I didn't know what he was saying". That evening, as he had done on several other occasions, he shaved the decedent. Upon cross-examination he admitted that, even though he was so described in the will, he was never known as "Peter D'Allesandro, *Jr.*"

(2) *Eva D'Allesandro*—a specific devisee's wife—stated that decedent visited their home every Friday and some years ago—1946, 1947 or 1948—told her that she and her husband would have a store in the property later given to her husband by this will. When she visited decedent on July 10th, in company with her husband, he seemed well, even to the extent, during the course of a discussion, of urging her husband to buy her an electric range. In company with her mother-in-law, after decedent's death, she searched decedent's living quarters and there saw a savings bond issued in Marie D'Allesandro's name. On her husband's return from the hospital on July 20th he described the decedent as "kind of . . . like dopey".

---

prior to 1942 decedent lived with a niece, Antoinette D'Allesandro, and her family, consisting of her husband and four children". After the death of Antoinette D'Allesandro in 1937 decedent continued to live with the husband and children until the husband's remarriage in 1942 to Margaret D'Allesandro, one of contestant's witnesses, at which time the four children withdrew from the household.

(3) *Ann M. Bernardini* (the former Ann D'Allesandro)—a specific devisee—visited decedent on July 12th and on July 14th talked with him on the telephone, and on both occasions he seemed rational.

(4) *Mary E. Donato* (the former Marie D'Allesandro—a specific devisee—stated that on a visit to decedent on July 12th he appeared rational.

(5) *Nicholas D'Allesandro*—a specific devisee—on a visit on July 19th found that, while decedent did not feel well, he was able to recognize him, appeared rational and discussed with him a recent visit made to decedent by a fellow-worker.

(6) *Rose Benedict*—first cousin, once removed and sole residuary legatee—testified that over a three-year[10] period she drove her father to and from work at the Allan Wood Company. During this time period approximately once a week she would pick up decedent and take him to work and almost daily would drive him home with her father. On July 19th, on the occasion of a visit to the hospital, she had a talk with Peter Masciantonio and, while talking to him in the hospital corridor, a visiting priest came along. She testified that it was Peter Masciantonio, not herself, who suggested to the priest that decedent, then critically ill, had no will. The priest then went into decedent's room and told him he should get a lawyer and make a will. Later the decedent beckoned to her and asked her to get a lawyer for him. Mrs. Benedict said that she left the hospital at 4 P.M., called Attorney DiGiacomo at approximately 4:30 P.M., but did not reach him until 5 P.M. She then accompanied Attorney DiGiacomo, her father and Marta Giondonato to the

---

[10] Cf: the statement of this witness contained in a letter sent to contestant some months after decedent's death: "It is about a year since I have had a license to drive a car."

hospital, arriving there at approximately 5:45 P.M., and she remained in the decedent's room while the attorney and decedent discussed a will and she saw the attorney writing on a yellow piece of paper. After the attorney had finished she saw the decedent make his mark on the paper, then she signed her name as a witness under the attorney's name. This handwritten will (*not the one presently in issue*) was produced and the witness identified her signature thereon. When these events took place the decedent recognized and talked with his visitors. On July 20th, between 3:30 and 4 P.M., she accompanied Attorney DiGiacomo to the hospital, heard him read to decedent the provisions of the typewritten will and, after she saw the decedent execute it by mark, she signed that will as a witness.

At the outset of her testimony she stated that she visited decedent daily while he was in the hospital, then later said she did not visit him between July 12th and July 19th, and again later stated she was confused about the dates but knew there was not a seven day interval between her visits. On July 19th decedent was "pretty sick", "dozing", and the witness "didn't bother talking to him"; on that date her father and Peter Masciantonio took decedent to the bathroom. When Attorney DiGiacomo and the other persons entered decedent's room on July 19th she introduced the attorney and the decedent recalled that the attorney's brother had once worked with him. While there was some Italian spoken, the conversation between Attorney DiGiacomo and decedent on July 19th was mostly in English, but on July 20th the will was read to decedent only in English. It was the decedent's custom to sign papers by mark.

(7) *Marta Giondonato*—a recent Italian immigrant—spoke and understood only the Italian language. This witness was present on July 19th in decedent's

hospital room when the decedent and Attorney Di-Giacomo discussed the terms of the will. *This witness, when asked whether most of the conversation between the attorney and the decedent concerning the will was in English or Italian,* testified: *"It was in Italian. Otherwise I would not have been able to understand."*[11] The witness related that she heard decedent tell the attorney that he had four houses and wanted to give one house to each of four nieces and nephews, that he wanted Rose Benedict to take care of his funeral, that whatever was left was to go to Rose Benedict and that he was leaving his insurance to his wife in Italy. Having seen the decedent place his mark on the will, she, at decedent's request, signed her name as a witness on the instrument. On July 20th she visited the decedent at the hospital but was not present when the type-written will was executed.

(8) *F. C. Hutchinson,* Vice-President of the executor bank, stated that decedent's realty was valued at $42,250.00 and his personalty, exclusive of bonds, at $14,250.97. In decedent's home were found, Series E. bonds in the amount of $6500; 1 $100 bond, issued August 1942, in decedent's name payable on death to "Annie D'Allesandro"; and 240 $25 bonds, issued between October 1942 and July 1955, in decedent's name payable on death to "Marie D'Allesandro". On August 10, 1955 he had a conversation with Eva D'Allesandro, a witness for contestant, wherein she stated that, prior to his departure for the hospital, decedent had given

---

[11] This testimony is in direct variance with the testimony of Attorney DiGiacomo and Rose Benedict. Attorney DiGiacomo testified: "I heard Mrs. Giondonato here make a statement on the stand that he talked mostly in Italian. *Well, that's not true".* Rose Benedict testified that the attorney talked to the decedent in English. If these two witnesses are correct, the testimony of Mrs. Giondonato as to what occurred at this time would seem worthless.

her approximately $400 to pay taxes and other expenses.

(9) *Bernard DiGiacomo*[12]—a member of the bar—first talked with Rose Benedict on July 19th at approximately 5 P.M. and then he accompanied her, her father and Mrs. Giondonato to the hospital. When introduced to decedent—who appeared "very sallow" and like a "man who was ill"—he shook hands, noting the strength in decedent's hand, and decedent spoke to him concerning his brother, with whom decedent had worked. The responses which decedent made to the questions addressed to him by the witness were very clear and he "understood" the "business". The conversation between the parties was practically entirely in English. After receiving instructions from the decedent concerning the disposition of his property he wrote a will in longhand which decedent signed by mark and which was witnessed by himself, Rose Benedict and Mrs. Giondonato, in that order. He told the decedent he would prepare a neater typewritten will which he would bring back for execution. On July 20th—accompanied by Rose Benedict—he returned to the hospital at approximately 3:45 P.M. He and decedent again shook hands and he read each paragraph of the will to decedent who then signed it by mark and it was witnessed by himself and Rose Benedict. It was his opinion that decedent then knew what he was doing and had the testamentary capacity to make a

---

[12] When this witness took the stand he formally withdrew as counsel. However, despite the fact that he knew that, as the scrivener, he would have to take the stand as the court's witness, he conducted the entire case for proponents and only at the end of the trial withdrew. The firm of which he is a member not only continued of record in the case but one of that firm argued the appeals before this Court.

will both on July 19th and July 20th.[13]   This witness explained that, after an extensive investigation, he had learned the identity of the priest who was present at the hospital on July 19th, a Father Walsh, but that since the priest remembered nothing of the incident he was not called as a witness.   The witness further explained that Rose Benedict's father, Michael Masciantonio, who was present on both July 19th and July 20th, was not called as a witness, although he was physically able to appear, because it would be distasteful to him.

In rebuttal both contestant and proponents produced testimony.   The contestant produced: (1) Paul Moser, timekeeping supervisor at the plant where both decedent and Michael Masciantonio were employed, to show by the time cards the times of arrival and departure of both men for the purpose of contradiction of that portion of Rose Benedict's testimony that she drove decedent and her father to and from work; (2) Peter Masciantonio, to show that he was with Rose Benedict when she left the hospital on July 19th at 6 P.M. for the purpose of contradiction of her testimony that she left the hospital at 4 P.M. and further to show that, after Nicholas D'Allesandro had testified in court, he stated in the courthouse corridor "he didn't think it was right the will was made out"; (3) Adamo DiGuglielmo, to show that decedent never visited the Benedict home for the purpose of contradiction of Rose Benedict and to relate a conversation which, allegedly, took place in Attorney DiGiacomo's office on July 22nd wherein the latter, supposedly said, referring to the will, "If I wanted to I could put myself in

---

[13] This witness stated: "I feel I am better qualified to determine whether or not a man has testamentary capacity, than any one else."

and nobody would know what was going on in there". The proponents recalled Attorney DiGiacomo to show that, although DiGuglielmo was in his office on July 23rd or July 24th, he never made any such statement to DiGuglielmo.[14]

The court below concluded, very properly, that there was no evidence of undue influence or fraud. With that conclusion we are in agreement. However, the court's conclusion that contestant failed to sustain her burden of proof of lack of testamentary capacity raises a very serious question.

A careful examination of the opinion of the court below and the reasons which it assigns for its conclusion that the record is without clear and strong evidence of testamentary incapacity indicates that the controlling and decisive factor in its conclusion was that "the evidence arrayed by the contestant in the face of the testimony of the subscribing witnesses consists primarily of the *opinion evidence,* of two physicians. The weight to be given to opinion evidence, standing against testimony of witnesses as to facts, has been given detailed consideration by our appellate courts." (Emphasis supplied).

Upon the court below rested the duty of balancing and weighing the evidence presented by both sides.

---

[14] It is to be noted that when the witness DiGuglielmo testified to this incident the Court warned him that he was making· an *accusation against a member of the bar.* When Attorney DiGiacomo, in rebuttal, denied the incident and referred to DiGuglielmo as a "numbers writer" the court cut off this reference. Yet the court in its opinion took this irrelevant testimony as a means of discrediting DiGuglielmo: "This implication [against the attorney] might be a most serious one, but coming from a witness of the type of Mr. Di Guglielmo, *known in the neighborhood as a gambler,* is of no great weight." (Emphasis supplied). There is no evidence of record concerning DiGuglielmo's reputation as a gambler.

Under such circumstances certain basic principles necessarily must guide a court: (1) the burden is upon the contestant to overcome the presumption of testamentary capacity; (2) to sustain this burden the evidence has to be strong, clear and compelling; (3) the testimony of the scrivener, the subscribing witnesses and the attending physicians is entitled to great weight; (4) it is the testator's testamentary capacity at the time the will was executed which controls; (5) the credibility of the witnesses must be determined on the basis of various factors including, in large measure, their interest or lack of interest in the outcome of the litigation.

An examination of the court's written opinion—the sole basis upon which we can determine the reasons which led to its conclusions—reveals that the court considered the testimony of the two subscribing witnesses—Attorney DiGiacomo and Rose Benedict—not only as of great weight but as absolutely controlling. The court treated their testimony as the *only factual,* as opposed to *opinion,* evidence as to decedent's testamentary capacity at the time of the execution of the will.

Was the testimony of these subscribing witnesses factual or opinion? Both witnesses testified to that which they personally observed of the decedent—what he said, how he said it, what he did and how he did it —and from such observations they arrived at a conclusion that decedent was mentally capable of executing a will. To label such testimony as entirely factual was clearly erroneous because their expressed conclusion as to testamentary capacity was simply an *opinion* arrived at after an observation of facts, i.e. their sensory impression of decedent's words and ac-

tions.[15] *Their testimony was neither entirely factual nor entirely opinion but mixed opinion and factual.*

In considering the reliability of such testimony certain factors had to be taken into consideration: what was the opportunity for observation by such witnesses, was there any reason for unfaithfully recording their observations and was there any corroboration of these witnesses? The *established opportunities for observation* by both witnesses of decedent's actions were two visits to the hospital, a 30-35 minute period on July 19th and a 15-20 minute period on July 20th.[16] The court sought to discredit Dr. Garfagno's testimony upon the ground that he only saw decedent on two occasions; was not his opportunity for observation equal to that afforded to the scrivener who saw decedent on only two occasions? *Both the subscribing witnesses were interested*: Rose Benedict as the sole residuary legatee was deeply interested in upholding the validity of the will and Attorney DiGiacomo, whose handiwork was under attack, was likewise a party in interest.[17] While the fact of their interest would neither automatically disqualify nor discredit these witnesses yet it was a factor requiring grave consideration in the evaluation of their testimony and the court below never

---

[15] Cf: Wigmore on Evidence (3rd. Ed.), Vol. II, §§657, 658, 659; *Patterson, Gdn. v. Snider et ux.*, 305 Pa. 272, 157 A. 612.

[16] It might well be argued that Rose Benedict had a greater opportunity for observation but the difficulty is that, under her own testimony, she first stated that she saw the decedent daily, then she stated that she didn't see the decedent from July 12th to July 19th and later stated that she was confused as to dates but was certain that there was not a seven day interval between her visits to the hospital.

[17] Where the attorney who draws the will participates in the trial of a contest upon the instrument, his testimony cannot be considered disinterested: 57 Am. Jur. §141, p. 130; *Culpepper v. Robie*, 155 Va. 64, 134 SE 687.

alluded to their possible interest. On July 19th and on July 20th when the handwritten and the typewritten wills, respectively, were drawn, four persons on the first day and two persons on the second day observed the decedent. Of these persons only the subscribing witnesses related that which was said and done on July 20th and only three persons testified as to what took place on July 19th. Michael Masciantonio—the residuary legatee's father—visited decedent on both days and, even though the record indicates that he was physically able to appear in court, he was not called as a witness. Marta Giondonato, if the testimony of the subscribing witness be believed, was entirely discredited as to that which transpired on July 19th. *Thus, the only two persons who were in a position to have corroborated the subscribing witnesses failed to do so.*

The court below, treating the subscribing witnesses' testimony as entirely factual as opposed to opinion, and ignoring the factors of both their interest and lack of corroboration, nevertheless considered their testimony as decisive on the question of testamentary capacity.

On the other hand, the court treated the testimony of the attending physicians as pure opinion evidence and applied to their testimony the rule that opinion evidence is of little weight as against the direct, factual evidence of the scrivener and subscribing witnesses.[18] The record indicates that both physicians were in attendance upon the decedent. Dr. Rappaport

---

[18] *Conway Will*, 366 Pa. 641, 643, 644, 79 A. 2d 208; *DeMaio Will*, 363 Pa. 559, 563, 70 A. 2d 339; *Sturgeon Will*, 357 Pa. 75, 82, 53 A. 2d 139; *Cookson's Estate*, 325 Pa. 81, 88, 188 A. 904; *Guarantee Trust and Safe Deposit Co., Guardian v. Heidenreich et al.*, 290 Pa. 249, 254, 138 A. 784; *Guarantee Trust and Safe Deposit Co. v. Waller*, 240 Pa. 575, 584, 88 A. 13; *Graham's Estate*, 225 Pa. 314, 317, 74 A. 169.

had made daily, and sometimes twice daily, visits over a ten day period for the express purpose of determining both the physical and mental condition of decedent as an aid in his treatment. Dr. Carfagno had made two visits to the decedent for the very same purpose. The testimony of both physicians is corroborated by the hospital records, Michael D'Allesandro, Peter Masciantonio, Joseph Gennaro and, in part, at least, by Marion Manfredi, a nurse. Even Peter D'Allesandro, a witness for the proponents, at least partially corroborated the testimony of the physicians concerning decedent's condition.[19] The record discloses no basis for any conclusion that the physicians were anything other than completely disinterested in the outcome of the case.

No reasonable basis exists for distinguishing between the quality of the testimony of the physicians and that of the scrivener and the other subscribing witness. The nature of the testimony of both groups of witnesses is exactly the same, being composed partially of their direct factual observations and partially

[19] The court commented that decedent on July 19th had seven visitors, all of whom, with the exception of Michael Masciantonio and the priest, testified that they were recognized by, and conversed with, the decedent. Such a comment is not fully supported by the record. Margaret D'Allesandro stated that on July 19th she was in the hospital almost five hours, that she had no conversation with decedent and that whatever remarks were addressed to decedent were "on one side". Peter Masciantonio testified that, except for a shake of the head, the decedent was unresponsive and unable to make a will. Joseph Gennaro stated "I walked in and got hold of his hand and I asked him how he felt and he mumbled something. What he said I did not understand". Later, when the witness was asked as to decedent's opening his eyes, he said: "Yes, he opened them, but he turned over to the other side and it looked to me like he was too sick to be talking to anyone." The only two witnesses who testified that decedent on July 19th recognized and conversed with them were a specific devisee and the residuary legatee.

of conclusions or inferences drawn by the witnesses therefrom. Under such circumstances the lower court erred in concluding that the testimony of either group of witnesses was of a higher quality than that of the other. The general rule as to the inferior quality of opinion evidence, stated above, was never intended to apply to a situation such as herein presented; the lower court's dogmatic assertion that the rule governed the physicians' testimony was clearly erroneous.[20]

The objectionable weakness of opinion testimony arises from the understandable fact that such testimony, by its very nature, necessarily consists essentially of the inferences drawn by the witness from the facts that he has either observed or had related to him; the witness is unable to *swear* that his inferences are correct but only that in *his opinion* those inferences are correct. It is this necessary reliance upon the *inferences* drawn by the *witness* from the facts that weakens opinion testimony. Where testimony consists only of the narration by the witness of actual observed facts, however, he is able to swear to the *truth of those facts* and the jury or hearing judge are left to their historic functions as the triers of fact because it then remains for them to draw their own inferences and conclusions from the facts testified to by the witness. Cf: *Ray, to use, v. Philadelphia,* 344 Pa. 439, 441, 442, 25 A. 2d

---

[20] Even opinion evidence loses much of its weakness when, as here, it is supported by factual testimony and the circumstances herein related by the witnesses. Thus, in *Henry's Estate,* 276 Pa. 511, 513, 120 A. 454, this Court said: "opinion evidence, standing alone, as it did, would not sustain a finding of forgery, in the face of the direct and credible evidence. . . .. Were the direct evidence discredited, or the opinion evidence strengthened by facts and circumstances, the case might be different." In accord: *Snedeker, Estate,* 368 Pa. 607, 609, 610, 84 A. 2d 568; *Young Estate,* 347 Pa. 457, 459, 32 A. 2d 901; *DeLaurentiis's Estate,* 323 Pa. 70, 76, 186 A. 359—all cases in which opinion evidence as to forgery was offered.

145; *Kluchinsky Estate,* 176 Pa. Superior Ct. 197, 202, 107 A. 2d 446.

The rule erroneously relied upon by the court below finds its most frequent application in two situations. In the first the medical witness has neither seen nor examined the decedent; instead he is asked a hypothetical question, often based upon the very facts in dispute and, in answer to that question, gives his opinion as to the testamentary capacity of an equally hypothetical individual who displays the symptoms stated in the question. Such opinions are quite properly afforded little weight: *Conway Will,* 366 Pa. 641, 643, 644, supra; *DeMaio Will,* 363 Pa. 558, 563, supra; *Guarantee Trust and Safe Deposit Co. v. Waller,* 240 Pa. 575, 584, supra.

In the second type of situation the medical witness testifies concerning observations which he made while examining the decedent some time before or after the execution of the will. We have consistently and correctly held that this more or less learned conjecture concerning the effect that pre-existing or post-existing conditions might have had upon the decedent's testamentary capacity at a later or prior date is admissible but is entitled to little weight: *Williams v. McCarroll,* 374 Pa. 281, 293, supra; *Conway Will,* 366 Pa. 641, 643, supra; *DeMaio Will,* 363 Pa. 559, 562, 563, supra; *Sturgeon Will,* 357 Pa. 75, supra; *Aggas v. Munnell,* 302 Pa. 78, 86, 152 A. 840; *Graham's Estate,* 225 Pa. 314, 317, supra. Neither situation is presented under the facts of this case.

It is well recognized that the testamentary capacity of the testator is to be determined by his condition at the very time of execution of the will although evidence of incapacity near the date of execution is admissible as tending to show lack of capacity on that day: *Skrtic Will,* 379 Pa. 95, 100, 108 A. 2d 750; *Wil-*

*liams v. McCarroll,* 374 Pa. 281, 293, supra; *Higbee Will,* 365 Pa. 381, 384, 75 A. 2d 599; *Lewis Will,* 364 Pa. 225, 231, 72 A. 2d 80. In the instant situation, one physician examined decedent five hours before and one hour after the time of the alleged execution of the will, and another physician examined the decedent two to two and one-half hours prior to the alleged execution of the will, and both witnesses indicated that decedent was then in a state of stupor rapidly approaching semi-unconsciousness, a final and common stage leading to the terminal end of the type of ailment from which decedent suffered. The rule which makes vital testamentary capacity at the time the will was executed was never intended to minimize and depreciate the weight of the testimony of attending physicians as to testator's condition so close to the time when the will was allegedly executed.

The importance of such testimony was clearly and forcefully recognized by this Court, speaking through Chief Justice HORACE STERN, in *Lewis Will,* 364 Pa. 225, supra, in which we held that the testimony of the decedent's attending physicians was of prime importance to the determination whether there was a substantial dispute concerning a material matter of fact (the testamentary capacity of the decedent) which would require the award of an issue d.v.n. We there stated (p. 229) : "In view of the number of these witnesses [decedent's doctor and eight nurses] who testified as to decedent's unsoundness of mind and inability to make a will at the time it was executed, together with the fact that they were all disinterested, that the doctor and the nurses, by reason of their professional training, were most competent to observe the condition as to which they testified, and the evidence they gave was clear and unequivocal, it is difficult to see how any testimony could more strongly support a petition for

the granting of an issue d.v.n.". It should be noted that the proponent's witnesses were herself, the scrivener and a subscribing witness and that the Court, speaking of their testimony, said (p. 231) : "While this testimony is entitled, of course, to careful consideration, it does not overcome the testimony presented by the contestants as to the physical and mental condition of decedent on June 30 at the time she executed the will . . . ." See also: *Dugacki Will*, 356 Pa. 143, 149, 51 A. 2d 627; *Patti's Estate*, 133 Pa. Superior Ct. 81, 91, 1 A. 2d 791.

In further refutation of the trial court's conclusion it should be noted that in *Glesenkamp Will*, 378 Pa. 635, 107 A. 2d 731, we afforded great weight to the mixed factual and opinion testimony of a psychiatrist who had actually examined the decedent. This testimony, together with other testimony concerning the decedent's condition, prompted this Court to state (p. 640) : "Since the testamentary incapacity of decedent was so clearly established we need not discuss the effect of a will drawn by an attorney and witnessed by a physician and a bank officer. Their opinions under the present circumstances, are of slight, if any, value. Certainly their expressed opinions of decedent's testamentary capacity were contrary to the overwhelming weight of the evidence."

Despite the statement of the scrivener in the instant case regarding his superior—even supreme—ability to judge testamentary capacity, it is clearly evident from an examination of the record that the two physicians were just as able—from the viewpoint of time, opportunity for observation and experience—to evaluate decedent's testamentary capacity. In evaluating the testimony of the physicians as against the testimony of the scrivener and other subscribing witness, the court below erroneously applied rules of law which had no

application to the situation. While it is the province of the court below, not our province, to weigh the evidence, yet, in so doing, that court must apply rules of law justly applicable to the situation with which it is confronted.

We cannot help but observe from the written opinion of the court below other serious errors which it committed in reaching its conclusion. Despite the fact that all of the witnesses for proponents, with one exception,[21] had some interest in the outcome of the litigation, no reference whatsoever is made in the written opinion to such a factor. Further, the court discredited Dr. Rappaport's testimony upon the ground of his definition of the word "execute" as meaning "to dictate or to write himself",[22] stating that the testimony establishes that "the testator did not speak the language well." There is no evidence on the record to support a finding of decedent's inability to speak English well and, on the contrary, both Rose Benedict and Attorney

---

[21] It is strange that the only disinterested witness for proponent, Marta Giondonato, was completely ignored by the court in its opinion except for a notation that she was among those present on July 19th.

[22] In noting this narrow and tortious construction we recall that which Mr. Justice (later Chief Justice) Woodward aptly said in *Daniel v. Daniel*, 39 Pa. 191, 212: "What is the distinction between that mental condition which is competent to understand a will, and that which is fit to make a will? If a microscopic vision could detect a distinction, who has scales nice enough to tell how much it would weigh in the jury box? The plaintiffs in error undertake to convince us that their cause was damaged by the witness testifying that the testator was fit to make a will, instead of testifying that he was competent to understand a will. We do not think the error, if error there was, did them any damage. We do not suppose the jury have been swayed a hair's breadth by one form of answer, more than by the other". See also: *Wogan v. Small*, 11 S. & R. 143; *Wilkinson v. Pearson*, 23 Pa. 117; *Dichter Will*, 354 Pa. 444, 47 A. 2d 691.

DiGiacomo testified that most of the discussion with decedent on both July 19th and July 20th was in the English language.

Many years ago Chief Justice TILGHMAN, speaking in *Irish v. Smith*, 8 S. & R. 573, 574, used language particularly apposite to the present situation: "Great regard is to be paid to the subscribing witnesses, and to the testimony of others who might happen to be present at the time of execution. But to exclude all other testimony would be altogether unreasonable. If no witnesses are admitted, but those present at the execution, and they are base enough to perjure themselves, it will be impossible to set aside a will made by a man of unsound mind. But besides, soundness of mind being but matter of opinion, the subscribing witnesses may be mistaken, though they are men of integrity. If others of equal integrity and understanding had seen the testator an hour before, and an hour after the execution of the will, and were of opinion that he was *non compos,* in consequence of a disorder not generally subject to intermissions, and supported this opinion, by relating the words and actions of the testator which induced them to think him of unsound mind, it would surely be proper, that the jury should hear those witnesses, in order to form a judgment of their own, as to the state of mind at the moment of execution". The court below, as appears from its opinion, for practical purposes excluded the attending physicians' testimony and in this respect it erred.

The fundamental error of the court below was its misapplication of a well-established legal principle—the weight of opinion evidence as against direct evidence—to a situation where the evidence was identical in quality. In reaching this conclusion we do not substitute our judgment for that of the court below. We

simply find that in weighing the evidence the court employed the wrong scales.

The contestant raised the further question that the residuary legatee, under the Wills Act, was incompetent to prove execution of a will by mark. Since that question was not raised in the court below it cannot be considered on this appeal.

Decree reversed with direction that the court below review the entire record in a manner consistent with this opinion with special reference to the relative weight to be accorded the testimony of the two physicians who attended the decedent during his last illness or, in the alternative, that the court exercise its discretion by directing a jury's determination of the issue of testamentary capacity under proper instructions in keeping with this opinion upon a re-trial; costs to abide the event.

DISSENTING OPINION BY MR. JUSTICE BELL:

This was a will contest involving the question of whether the testator possessed or lacked mental capacity at the time he made his will on *July 20,* 1955, at approximately 4 p.m. If the Orphans' Court Judge who sat as the jury and the hearing Judge believed the *factual* testimony of the subscribing witnesses in this case—the lawyer-scrivener and Rose Benedict—testator, without the slightest doubt, had mental capacity; if not, the "opinion" evidence of the doctors would prevail. In the last analysis, it's as simple as that!

As Justice STEARNE said in *Glesenkamp Will,* 378 Pa. 635, 107 A. 2d 731, where an Orphans' Court Judge sat as Judge and jury and found that the testator did not have testamentary capacity (page 636): "The findings of fact are, therefore, equivalent to a verdict of a jury. On appeal the function of an appellate court is to determine whether or not the hearing judge's find-

ings of fact and conclusions of law, approved by the court in banc, are sufficiently supported by the evidence." See to the same effect: *Kerr v. O'Donovan,* 389 Pa. 614, 635, 134 A. 2d 213.

Ermindo Masciantonio, hereafter called the testator, was married in 1904. He came to the United States from Italy in 1905. He left his wife in Italy nine months after their marriage and never saw her again. He lived for a period of 24 years (from 1918 to 1942) in Conshohocken with *a niece, Antoinette* D'Allesandro (who died in 1937) and her family, consisting of her husband and four children. Antoinette's four children are the devisees of his four pieces of real estate in Conshohocken. Antoinette's widower married in 1942 Mrs. Margaret D'Allesandro,—a disappointed legatee—and Antoinette's children went elsewhere to live. Testator lived alone the last two years of his life. Testator after 1942 used to visit Antoinette's children and his first cousin once removed, Rose Benedict, the residuary legatee, who continued to see and look after him until his death. He stated orally and in his will that Rose should attend to his funeral and that he should be buried with her mother and father.

Testator did not will his estate to his wife, whom he specifically disinherited, or to any of his foreign nephews and nieces whom he hadn't seen; he left his property in his will to his four grand-nephews and grand-nieces with whom he had lived for 24 years, and to the Church, and to Rose Benedict, his first cousin once removed. I believe that under the facts and circumstances this was a natural will.

Testator's wife and his nine nephews and nieces who live in Italy, contested the will on the ground that testator lacked mental capacity. If they were successful, none of his grand-nephews and grand-nieces with

whom he lived in Conshohocken for 24 years or Rose Benedict or his Church would receive anything. The Orphans' Court Judge, who sat as jury and Judge and *who saw and heard the witnesses* and who believed the testimony of the proponents, including particularly the subscribing witnesses (one being the attorney who drew the last will, and the other the residuary legatee), and Marta Giondonato (a disinterested witness who witnessed a hand-drawn will dated July 19, a replica of the typewritten will which testator executed the next day) found that the testator had testamentary capacity.

If the jury's verdict is sustained, his wife will receive property with a total value of over $11,000;* each of his favorite grand-nephews and grand-nieces will receive a piece of real estate in Conshohocken valued at $10,000; his Church will receive $3,000; and Rose Benedict, his first cousin once removed and residuary legatee, will receive $11,000. If the will is not sustained, his wife, whom he has not seen for 49 years, and his unseen nephews and nieces in Italy will receive all of his estate—the Church and his grand-nephews and grand-nieces with whom he lived in Conshohocken for 24 years, and his favorite first cousin once removed, who was to look after his funeral, will receive nothing.

The law is well established that "where a will is drawn by decedent's attorney and proved by subscribing witnesses, the burden of proving lack of testamentary capacity . . . can be sustained only by clear and strong or compelling evidence of lack of testamentary capacity . . .": *Higbee Will*, 365 Pa. 381, 382, 75 A. 2d

---

* A farm in Italy, on which his wife is now and for years has been living, having a value of $6500; $3,000 of life insurance, in which she was the named beneficiary; and a $1624 bank account in Rome.

599; *Williams v. McCarroll,* 374 Pa. 281, 97 A. 2d 14, and cases cited.

It is also well established that opinion evidence (of medical experts) is of little weight against the direct *factual* evidence of the scrivener and the subscribing witnesses, and should be entirely disregarded when contrary to established facts (i.e. established by credible testimony) revealing mental capacity: *Cookson's Estate,* 325 Pa. 81, 88, 188 A. 904; *DeMaio Will,* 363 Pa. 559, 563, 70 A. 2d 339; *Phillips's Estate,* 299 Pa. 415, 149 A. 719; *Klein's Estate,* 207 Pa. 191, 56 A. 422.

In *DeMaio Will,* 363 Pa., supra, the Court said (page 563): "In Cookson's Estate, 325 Pa. 81 (1937), the late Chief Justice KEPHART said, at p. 88: '. . . expert medical opinions are of little weight when based upon insufficient facts, or an erroneous conception of testamentary capacity, and should be entirely disregarded when contrary to established facts revealing mental capacity."

In *Cookson's Estate,* 325 Pa., supra, *the family doctor* had attended the testatrix for a considerable period of time and saw her approximately *3 hours before* the codicil was executed at noon. The doctor testified that at noon she was extremely toxic and in her condition her mind could not have been clear, nor would she have the mental capacity to make a codicil; "her condition was the same, if not worse, at 3 o'clock as at noon . . . ." With reference to this testimony, this Court said (page 88): "This court has stated on many occasions that expert medical opinions are of little weight when based upon *insufficient facts* or an erroneous conception of testamentary capacity, *and should be entirely disregarded when contrary to established facts revealing mental capacity.** . . . Mr. Foster [who

---

* Italics throughout, ours.

was the scrivener and a subscribing witness] had been decedent's agent for a long period of time and was fully conversant with her ability to supervise her business affairs. *If she was as mentally alert as he testified and actually conversed with him in the manner related by him, it is evident that she possessed testamentary capacity.*" The same rule about "opinion" evidence was reiterated with respect to family or attending physicians in *Phillips's Estate,* 299 Pa. 415, 149 A. 719, and in *Klein's Estate,* 207 Pa. 191, 56 A. 422; and appears to be recognized by the majority. The majority opinion says: "The rule erroneously relied upon by the court below finds its most frequent application in two situations. In the first the medical witness has neither seen nor examined the decedent; . . . . In the second type of situation the medical witness testifies concerning observations which he made while examining the decedent some time before or after the execution of the will. We have consistently and correctly held that this more or less learned conjecture concerning the effect that pre-existing or post-existing conditions might have had upon the decedent's testamentary capacity at a later or prior date is admissible *but is entitled to little weight*:* Williams v. McCarroll, 374 Pa. 281, 293, supra; Conway Will, 366 Pa. 641, 643,·

---

* In view of the fact that the majority recognize this principle of law, we do not understand the reason for its citations of and quotations from the following cases, all of which are clearly distinguishable:

In *Lewis Will,* 364 Pa. 225, 72 A. 2d 80, decedent made her will on June 30th in the hospital and died the next day. In this case the proponents proved the will by the testimony of the attorney and a subscribing witness. The attorney's testimony was weak. Decedent's attending physician and 8 nurses who saw decedent on June 30th (one within half an hour of the execution of the will), plus 7 lay witnesses, all of whom testified she could not talk intelligently or recognize them, was held by this Court to be *suffi-*

supra; DeMaio Will, 363 Pa. 559, 562, 563, supra; Sturgeon Will, 357 Pa. 75, supra; Aggas v. Munnell, 302 Pa. 78, 86, 152 A. 840; Graham's Estate, 225 Pa. 314, 317, supra."

The majority opinion does not grant a new trial on any question of lack of credibility of the attorney who drew and witnessed the will, and of the subscribing witness, or on the weight of the evidence (which, as we shall see, favored the proponents), because under the authorities above cited that is not legally possible. The majority grants a new trial solely because the court below treated the testimony of the attending physicians as opinion evidence—which it unquestionably was—"and applied a well established legal principle—

*cient to grant an issue d.v.n.* on the ground of mental capacity and undue influence.

In *Glesenkamp Will*, 378 Pa. 635, 107 A. 2d 731, the orphans' court judge, sitting as *a jury*, found that decedent did not have testamentary capacity to make his will dated October 31, 1951. In that case the will was prepared by a lawyer and witnessed by a bank officer and decedent's physician. Decedent was born in 1892, weak-minded. On May 26, 1947, a guardian was appointed for his estate after he had been adjudged to be weak-minded, unable to take care of his estate, and liable to become the victim of designing persons. It was admitted that "decedent had the mental developments, habits and intellectual attainments of a child of approximately *five* years." The Court in an opinion by Justice STEARNE, said (page 636) : "The findings of fact are, therefore, equivalent to a verdict of a jury. On appeal the function of an appellate court is to determine whether or not the hearing judge's findings of fact and conclusions of law, approved by the court in banc, are sufficiently supported by the evidence." The Court also stated (639-640) : "The determinant question is whether or not decedent possessed *sufficient* mental capacity to make a will. . . . In testing the extent of decedent's testamentary capacity, Dr. Henninger, a psychiatrist, called by the proponent, testified: 'Anxious to determine, if I could, to what extent he was aware of his worldly goods, we went into that to some extent. He had no definite knowledge of his wealth at all. He knew that he had a guardi-

the weight of opinion evidence as against direct evidence—to a situation where the evidence [of the doctors, and of the attorney-scrivener and the subscribing witnesses] was identical in quality." In other words, the majority opinion treats the clear, direct, unequivocal, *factual** testimony of the attorney who drew the will and the *factual** testimony of the subscribing witness and of Marta Giandonato as if it was merely "opinion" evidence, which it equates with the opinion* evidence of the doctors. *This is contrary to all the cases and unwittingly, although effectually, emasculates the well established rule which it professes to uphold.* Equally important, the majority opinion fails to erect a guidepost or rule to govern future cases where this exact question will often arise.

---

an and that money came from the bank to him, and that he owned the house he lived in, and that he had enough he didn't have to work. I wouldn't feel that beyond that he had much knowledge of his means at all.' Upon this evaluation the doctor was of opinion, as were proponent's other witnesses, that decedent possessed sufficient testamentary capacity to make a will provided that all decedent was required to know was a 'general' knowledge of what property he possessed and his next of kin. The witness frankly stated that, if the requirement of such testamentary capacity necessitated a 'full' knowledge of his estate and kindred, decedent did not have such capacity. Our examination of the evidence convinces us, as it did the learned hearing judge and the court in banc, that the decedent was so mentally deficient that he was incapable of possessing, and did not possess, the quantum and quality of knowledge of his estate and the natural objects of his bounty which he was required to possess in order to have testamentary capacity." The Court also stated (page 640) : "We are not favorably impressed, however, with the manner and circumstances under which the will was prepared and executed." That case was so obviously correctly decided and the propositions of law cited therein so sound, that we cannot understand how the majority opinion believes it supports the conclusion it reaches.

* Which in each case it terms mixed fact and opinion.

Although both the majority opinion and this dissenting opinion agree that the sole question involved is whether the doctors' *"opinion"* evidence can be equated with the evidence of the attorney who drew and witnessed the will and of Rose Benedict, the other subscribing witness, and of Marta, nevertheless, the majority opinion inadvertently treats the case, in large part, as if the question involved was (a) whether or not an issue should be granted, and (b) what credibility and weight should be given to the testimony of the proponents' witnesses. Although it is immaterial, the majority opinion then dissects the testimony of the proponents' witnesses in order to show the weaknesses in their case. It could more easily and wisely have analyzed and portrayed the weaknesses, the contradictions, the inconsistencies and the conflicts in contestants' evidence, particularly the testimony of Dr. Rappaport—this, however, it failed to do.

Contestants presented 12 witnesses—only the testimony of Dr. Rappaport and Dr. Carfagno is material in this appeal. Proponents presented 10 witnesses— only the testimony of Mr. DiGiacomo (the attorney who drew and witnessed the will), and of Rose Benedict (subscribing witness), and of Marta Giondonato, a disinterested witness who was a subscribing witness to testator's will of July 19th, (and several additional lay witnesses who contradict Dr. Rappaport), is material in this appeal. Nevertheless, the majority opinion, by going far afield, compels us to review some of the testimony.

## Illness

Testator was a hard-working man. Although 68 years of age at the time of his death, he worked as a foreman at the Alan Wood Steel Company in Norris-

town until his admission to the hospital on July 10, 1955, *11 days* before his death. He often worked two consecutive 8 hour shifts at the steel plant.

On July 10, 1955, testator felt ill and was taken to the Sacred Heart Hospital in Norristown. On July *19th*, having been advised by a priest—according to the evidence of both the contestants and the proponents —to get a lawyer to make his will, he sent for an attorney (Mr. DiGiacomo) whom he told *in detail* the persons to whom he wanted to give each of his four pieces of real estate, $3,000 to the Church, and the rest to Rose Benedict, as well as the other provisions clearly set forth in his will. Dr. Rappaport expressed his opinion (for contestants) that because of testator's stuporous condition, this was impossible. Mr. DiGiacomo knew Rose Masciantonio Benedict very slightly; he did not know testator's devisees, or who were the testator's relatives or their names, or what real or personal property he had; so that it would have been impossible for him to have written such a will unless the testator or Rose Benedict gave him the information. DiGiacomo testified that testator gave him all the detailed directions about the gifts and provisions he wanted to make in his will, and that no one prompted the testator or made any suggestions to him. The jury and the Judge believed DiGiacomo and Rose Benedict and Marta Giondonato who corroborated him.

Mr. DiGiacomo wrote down in longhand on July *19th* exactly what Ermindo Masciantonio told him he wanted in his will, and the will was then witnessed by him and by Rose Benedict, the residuary legatee, and by a disinterested witness, Marta Giondonato. Rose Benedict and Marta corroborated DiGiacomo about all the directions testator gave DiGiacomo. Mr. DiGiacomo thereupon returned to his office, made a typewritten copy of the will so that it would be neater, and

on the following day, to wit, *July 20th,* returned to the hospital (as he promised testator he would) with Rose Benedict at sometime after 3 o'clock p.m. He then went over the will with the testator *paragraph by paragraph,* and explained its contents to testator paragraph by paragraph, all of which testator approved. Testator being unable to sign his name, placed his mark opposite his name at the place designated by Mr. DiGiacomo. DiGiacomo and Mrs. Benedict then signed their names as subscribing witnesses. Their testimony will be more fully hereinafter discussed. Suffice it to say at this time, that the testimony of Mr. DiGiacomo was very clear, direct, detailed and unequivocal, and his testimony and that of the other subscribing witness, Rose Masciantonio Benedict, who corroborated him as to what occurred on July 19th and July 20th, and of Marta Giondonato as to what occurred on July 19th, was believed by the jury and Judge who saw and heard all the witnesses.

On July *20th* Rose Benedict and Marta Giondonato went to testator's hospital room at about 6:30 p.m.; at 6:45 p.m., Peter D'Allesandro, grand-nephew of the decedent, also visited the testator who was sitting up in bed. They narrated testator's conversation with them. Peter shaved testator about 7 o'clock p.m. on July *20th.*

The majority opinion seeks to completely discredit the testimony of the lawyer, DiGiacomo, who drew the will, and of Mrs. Rose Benedict, the other subscribing witness, who corroborated him, and of Marta Giondonato, who spoke and understood only Italian, and who was present when testator signed his will on July 19th, by pointing out that Marta said *most* of the conversation on July 19th was in Italian, whereas DiGiacomo said *most* of it was in English. Marta did not testify about testator's conversation with DiGiacomo

on July 20th. How unjustifiable that conclusion is will be instantly apparent from Marta's testimony.

Marta Giondonato was an entirely disinterested witness. She testified that she and Rose Benedict and her father and Mr. DiGiacomo arrived at the hospital on July *19th* about a quarter to six; that she heard the testator speak to DiGiacomo. She then pertinently testified: "Q. Will you tell the court what you heard the decedent say to me? A. *I heard him say that he had four houses; that he wanted to give one house to each of the four nieces or nephews.* Then, he said that he desired that his niece, Rose Benedict would—first of all, he hoped that he would return home; but, if he did not return home, that he wanted her to take care of his funeral. He wanted to be buried in the same grave, or in the same place where Rose's mother and father were buried so that they would be together in the hereafter. *And, he also desired that whatever was left would go to Rose. Said he wanted to leave three thousand dollars to the church, and, whatever was left, was to go to Rose.* Q. Did you hear him make any statement concerning his wife in Italy? A. Yes. Q. What did he say? A. He said he was leaving the insurance to the wife. Q. Did you visit the decedent in the hospital at any time before the *19th* of July? A. *Yes, before that time and also after that date.* Q. On any of those occasions, did he seem to you that he did not realize what he was doing? . . . A. Yes, he understood very well. . . . Q. I show you what has been marked for identification exhibit 'B', [testator's will of July 19th] and ask you if you can identify the signature appearing as the last signature on the second page thereof?" She then identified her signature to testator's will of July 19th and testified she saw Mr. DiGiacomo sign testator's name to the document and saw testator make

his mark on the exhibited document. She also saw Rose M. Benedict sign her name.

On cross-examination Marta testified: "Q. Did you hear everything Poppy said about his will, to Mr. DiGiacomo? A. Yes, I understood the most of it. He said some words in English, I did not understand that. Q. Did he speak in English? A. Sometimes he says; but, he talked in Italian, generally. Q. Could you tell us whether *most* of this conversation concerning this will was either in English or Italian? A. It was in Italian. Otherwise I would not have been able to understand. . . . By the Court: Q. Did you hear Poppy speak at all about his church? A. Yes. Q. What did he say? A. Said he wanted to leave three thousand dollars to his church. Q. In talking about his four houses, did he talk about the four houses in Italian? A. Yes, and then, *he also said in English about that; because the lawyer many times would repeat the things that Poppy said.* . . . Q. Did he speak anything about his wife in Italy? A. The only thing I heard him say about his wife was that he was leaving his insurance to the wife."

Mr. DiGiacomo testified, as will hereinafter fully appear, that on July 19th *most* of the conversation between him and the testator concerning the will was in English. Marta testified that *most* of the conversation was in Italian. That honest difference in recollection or counting is de minimis. Certainly it is an obvious non sequitur to say that Marta's detailed testimony as to what she heard testator tell his attorney in Italian to place in his will,—namely, he wanted to leave his real estate to his nephews and nieces, naming them, $3,000 to the Church, and all the rest to Rose—was thus entirely discredited and "worthless".

The majority opinion also implies that the testator's lawyer and the *proponents* of his will must have

been lying when they testified that testator gave his attorney, DiGiacomo, his directions about the persons to whom he wanted to leave his estate because they failed to call the priest who, on July *19th,* advised the testator to get a lawyer to draw his will. Contestants' star witness, Mrs. Margaret D'Allesandro, who for years had not spoken to her step-children (who are the testator's devisees), admitted that the priest saw testator on the afternoon of July 19th and advised him to get a lawyer to draw his will. Does anyone for one moment believe that a priest would advise a man who was obviously dying, to get a lawyer, if the man was so stuporous that it was impossible for him to make a will?* And in view of Mrs. D'Allesandro's testimony of her conversation with testator the first four or five days he was in the hospital and on July 19th, what reliance can be placed on Dr. Rappaport's opinion about testator's "stuporous" condition on those days!

It is an indisputable fact that the jury and the Judge believed the lawyer and the other subscribing witness and consequently found that testator had the mental capacity to make his will on July 20th. While the majority's attempt to discredit proponents' evidence was an utter failure and no rejoinder was necessary, it is equally clear that its analysis of much of the evidence was immaterial, in view of its position: A new trial should be granted solely because the hearing Judge held that the *opinion* evidence of the doctors was equal to the *factual* evidence of the attorney and of the subscribing witness, Rose Benedict, and of Marta Giondonato.**

---

* We note that the priest's testimony was equally as available to contestants as to proponents.

** And (we may add) likewise of five other witnesses who testified to conversations with testator which Dr. Rappaport said was impossible because of testator's stuporous condition.

The Real Issue

While the testimony was conflicting, as is usual in will contests, the contestants' entire case boils down—as the majority finally admit—to the *opinion* evidence of Dr. Rappaport and Dr. Carfagno. Dr. Rappaport was not only contradicted by Dr. Carfagno as to testator's capacity prior to July 20th, but also by 8 witnesses (including DiGiacomo and Rose Benedict and Marta Giondonato) for proponents, but also by contestants' star witness, Mrs. D'Allesandro, who said testator seemed all right until the last four or five days.

When testator was taken to the hospital on July 10th he was examined by Dr. Rappaport, who testified that he was mentally depressed and greatly jaundiced. On a subsequent examination, Dr. Rappaport found a mass in his abdomen and swelling of the ankles. Dr. Rappaport testified that on July 10th when he was admitted to the hospital he could only talk with difficulty; that on July 19th he was unable to talk; that because of his stuporous condition he was absolutely not in condition to give the information which was contained in his will of July 19th and of July 20th; and that it was not possible for him to have had a lucid interval on July 19th or 20th.

On cross-examination Dr. Rappaport contradicted his direct testimony and said: "He was able to express himself on the tenth very clearly and he used good English. . . . and he had intelligence." Dr. Rappaport admitted that prior to July 20th he never noted on the hospital record (which he made out) that testator was stuporous; that he saw him every day for only 10 to 15 minutes, except on July 20th, when he saw him around 11 o'clock in the morning for about 10 or 15 minutes, and again at 5 o'clock in the afternoon for 5.

minutes. He further admitted that on July *14th* he entered in his own handwriting in the hospital records: *"Clinically the patient much better. Jaundice still present. Patient will go home Saturday"* [to his home where he lived all alone]. Nevertheless, he further testified "that this man on the 20th *and even on the 10th and any time in between could not execute this copious will"* [the will was short and simple]; that on July 20th testator *could not communicate with any individual or sign a will between 11 o'clock in the morning and 5 o'clock that evening; that he did not have strength to talk;* that he did not think testator could recognize any of his relatives at around 6 o'clock on the night of July 20th.* Testator, who died of carcinoma of the liver, jaundice and hepatitis, never received any narcotics or sedatives the whole time he was in the hospital.

Dr. Carfagno was called in by Dr. Rappaport as a specialist on *July 17th.* He examined testator on *July 17th* between 1:15 and 2 p.m. and *found him responsive and that the patient did not have too much difficulty in expressing himself.* The doctor estimated he was with the patient on July 20th five, perhaps ten, minutes. He was asked this additional question on direct examination: "Q. You have read this will, Doctor. I want your opinion, as a result of this examination and your observation of this patient that you made on the *20th* of July, was this patient able to dispose of his property and sign this will as he is alleged to have

---

* Notwithstanding the fact that I believe the doctors gave their *honest* opinions, Dr. Rappaport's testimony was not only inconsistent, but it was so contradicted by the testimony of lay witnesses as to testator's physical and mental condition and his conversations with them, and in an important matter, by Dr. Carfagno, that it is doubtful whether it would have been sufficient to entitle contestants to an issue.

done? A. From the observations I made on the 20th it would be *my impression* that he would not be able to."

On cross-examination, Dr. Carfagno testified: "Q. You will not venture an opinion then on July *19,* 1955, whether or not this man had that mental capacity with which to execute a will? A. I don't think I am in a position to say what happened on the 19th. . . . Q. Doctor, if someone were to say to you that in around six o'clock on July 20th that they visited the patient, that the patient recognized these visitors, and that then the visitor proceeded to shave the patient, would you believe that narrative? A. I would be surprised, but I figure there is a possibility, not very probable." Dr. Carfagno then told the Court, in answer to the Judge's questions, that at the time he saw testator on July 20th at about 1:30 p.m. for 5 or 10 minutes, "he was not lucid. *It is possible that he could have lucid intervals* from the time I saw him until the time he died. This appears to me unlikely based on my previous observations. Q. Unlikely, but it is possible? A. It is possible."

It is obvious what a tremendous difference there is between the testimony of Dr. Rappaport and Dr. Carfagno.

Far more striking and in view of the question involved, far more important, was the testimony of the attorney, Bernard V. DiGiacomo, who was believed by both the jury and the Judge. DiGiacomo was called by Mrs. Benedict on *July 19,* 1955, at about 5 o'clock. As a result of that telephone call he went with her and her father\* and Miss Marta Giondonato to testator's

---

\* Proponents' case was obviously weakened by the failure of Rose's father to testify; the excuse for such failure was a lame one.

room in the Sacred Heart Hospital, arriving there about 5:40 p.m. The patient was obviously jaundiced and ill. Testator remarked that he knew DiGiacomo because his brother Lou had worked for him. DiGiacomo asked testator to squeeze his hand, which he did. He then testified that testator's responses were very clear to him; that he understood his business there; that he was responsive to the questions DiGiacomo put to him; that they discussed how he felt, how he was eating; whether everything was going all right; how the nurses were treating him; and other small talk. There then occurred the following exceptionally important *factual* evidence which can best be portrayed by quoting it:

"Then, I did explain to him why I was there; that Mrs. Benedict had called me, and that he had made known his intentions to her that he wanted to make a testament and he wanted to make sure that he could give away his property before he died. And he said: ʻYes, that's what I want you for.' And then, I began interrogating him about the will. Q. As you spoke to him about the will, what did you do? A. Well, I recall that I said to him something about: ʻNow, you want your funeral expenses paid for, and you want your burial paid for, and, if you owe anybody money, you want to pay them, too. Is that right?' And, he started to talk to me in Italian. Well, I don't speak the Italian language, and I never trust myself too much on understanding it. And, I told him. I said, in Italian to him, as best I could say it, I said: ʻTalk to me in English.' And, he would —told me in English, ʻYes, it's all right to pay all my bills.' Then, I said to him: ʻNow, what do you want to do with your property?' He then would name a property. He would say: ʻMy house.' And, I would say: ʻWell, where is it?' He would give me the address, just as they appear in this

will and in the will which was probated. And, I would ask him who he would want to give it to, and he would tell me. And, I would ask him: 'Is he a cousin of yours, or something like that?' He called these children, the D'Allesandros, his nieces and his nephews. Q. To interrupt you for just a moment. As he would name these parcels of real estate and say what he wanted done with them, were you simultaneously, drawing this will, or this exhibit, whatever it is that is before you—instrument, that was executed on the 19th? A. What I would do is: after he had told me he wanted to give a house, and I would ask him these questions, and what not, and after I got it all straight, I would write it down, and then repeat it back to him and ask him if that is what he meant. And then he would say: 'yes.' For instance, I remember his coming down to the two D'Allesandro girls, Ann D'Allesandro and Mary D'Allesandro, and he left a property to Ann D'Allesandro. And, I said to him: 'Well, is she married?' He said: 'Yes.' I said: 'What is her married name? What is her name now?' He said: 'Oh, I don't know,' he said. I remember looking up to ask Rose Benedict, because I felt pretty sure that she was familiar with these D'Allesandros—if she knew their married names. And, she did not. And that is why, in the will, it appears that the marriage name was unknown, or, as it appears here, 'The former Ann D'Allesandro,' and, 'The former Mary D'Allesandro.' Then, he went on down through the rest of the will and he came down to the church. And, by the way, I want to say now, I heard Mrs. Giondonato here make a statement on the stand that he talked mostly in Italian. Well, that's not true. As a matter of fact, he would have to speak to me—I would say more in English, because no matter what he would say in Italian, I would want him to repeat it in English. And, some of the things he would say in English,

first. Now, he came down to the church, and he wanted to give three thousand dollars to the church. I did mention the name of the church. That's correct. I said to him, I said: 'Now, what church do you want to give this to?' He said: 'You know, the Italian church.' I said: 'The Italian church in Conshohocken?' He said: 'Yes.' So, being familiar with there is only one church in Conshohocken, and that's why St. Cosmos and Damian Church appears in the will. Then, after he got through with that, he said that that was all the property that he had. And I said: 'Now, do you have anything beside property?' Because, being familiar with the old Italians, when they talk about property, they talk about real estate. I said: 'Do you have anything else? Do you have a bank account, or anything like that?' He said: 'Oh, yes. I got money in the bank.' I said: 'What do you want to do with that?' I said: 'You ought to leave it to somebody. You are making a will, you ought to leave the rest of whatever you have to somebody else, or, to one of these children.' So, he pointed down to Rose, and he said: 'You give it to Rose, because, Rosie is going to bury me and take care of me if I die.' I said: 'Do you want her to take charge of the funeral, and the burial?' He said: 'Yes.' Now, I did talk to him about the fact that he had a widow in Italy, and I said: 'Now, what do you want to do about this wife of yours in Italy?' And, he said: 'I don't want to give her anything.' So, I had explained to him, as best I could, without using any technical terms, that she might have a right to come over here, or, through some representative, make a claim against the will; and, if she did, how she might be successful. And, he understood. He understood me. And, I went a little further, and I asked him: 'Now, if she wins; if she comes over here and she is entitled to something, who do you want her to take it

from? Do you want her to take it from one of them, from all of them?' He said: 'No, each one has to give their share.' Now, as to the executor in the will: I explained to Mr. Masciantonio that he should have an executor in the will. Now, as I recall it, he didn't understand——he didn't quite understand that too well, and, I think I used the word administrator. He understood that a little better. I think, it, more or less, corresponds to the Italian word. And he said: 'Well, I don't know,' he said, 'how about you?' And, I didn't know whether he meant about I being the executor, or, what did I think. I interpreted it to be the latter. And, I told him that I would recommend that some bank be appointed. And, he said: 'Well, you take care of it. Whatever you say is all right.' We came to the end of the will. Of course, actually, I had asked Rose Benedict, on the way up to the hospital, whether or not he could write his name. But, anyhow, I did ask him, prior to his affixing his mark, whether or not he could write his name. He told me he couldn't. I asked him if he could make a mark and he said: 'Yes,' he could make a mark. I said to him: 'Now, somebody has to write your name here. Who do you want to write your name on here?' He said: 'You write it.' So, I wrote his name on the will, leaving a space between the surname, the Christian name, and the last name, and asked him, then, I said: 'You want to sign it?' He said: 'Yes.' I said: 'Here.' And, I handed him the pen and he made an X on this will. It was a little——his hand was not real steady, and yet, I wouldn't say it was shaky. But, the mark was legible, but, it wasn't real firm. And, I said to him, I said: 'Do it a little harder. Make it a little firmer.' And, he went over it. And, I said to him—oh, by the way, I had, at that time—prior to that time—I had asked this woman back here, Mrs. Giondonato and Mrs. Bene-

dict to come over prior to this time—and, I said to him, I said: 'Now, look. You have to have witnesses on a will like this.' I said: 'Now, who do you want to witness it?' And, he said to me: 'Well, everybody.' And, there were just the three of us there in the room. And, the furthest one, I think, was Rose Benedict, and, she couldn't have been standing, oh, any further than this (indicating) away from him. Q. You are indicating about five feet? A. Or less; in that vicinity. So, I signed my name, first; Rose signed her name. And then, Rose, as I recall it, explained to Miss Giondonato, in Italian—because, she had said this to me in English—that he just asked her to sign her name on this will. That is, as to the execution of the will. Q. Now, with respect to each of the paragraphs which appear on that will, would it be fair to say that there was conversation in both Italian and in English? A. I don't want to say that, because, I am not sure that everyone of them was in Italian. Everyone of them was, definitely, in English. Q. With respect to many of the paragraphs, at least, might it not be said that there were remarks made in Italian, as well as in English? A. Oh, yes. Q. And, as these remarks were made in Italian, were they, in your opinion, made within the hearing of Miss Giondonato? A. Yes. . . ."

"By Mr. Lowe: Q. Now, Mr. DiGiacomo, after this instrument, which has been identified as exhibit 'B', which is now in evidence, was executed by the decedent, what arrangements, if any, were made with respect to the following day? A. Before leaving the hospital, after this document was executed, I told the decedent that I was going to take it down to the office and make another one on the typewriter, so that it would look neater, and bring it back and have him sign it again. And that is what I did. Q. The following day, was of course, July 20, 1956? A. '55. Q. 1955.

I beg your pardon. Please tell us what happened on that day. A. I would say it was some time after three o'clock. I had made arrangements to pick up Rose Benedict to go back to the hospital. I picked her up, and got up to the hospital somewhere in around quarter to four that afternoon. Q. Was there anybody there when you arrived? A. There was not. Walked into the room, walked over to the bedside. And, I wouldn't say he was sleeping but, I would say that he just wasn't aware of anybody being in the room. Looked like he might have been day-dreaming. I said hello to him, and he looked up, and he saw me, and he saw Mrs. Benedict, who had walked around the side of the bed with me. He said: 'Hello.' I asked him how he was feeling. He told me he wasn't feeling too good; he wasn't feeling as good as he was yesterday. I asked him to shake my hand, again. Which he did. I said: 'Squeeze it.' Which he did. And, he had about —almost as much strength as he had the day before. At least, in his hand. So, then, I told him that I came back with that—with the will he made yesterday, except it was made on the typewriter and, it looked a little bit neater. And, I told him that I wanted him to listen to me—I guess I was just being a little over-cautious—but, I read the will to him verbatim, just as it was drawn. And then, I took each paragraph separately, and went over the paragraph, explaining to him exactly what was in it, and asked him if it was all right, if that was the way he wanted it. And, he would reply, 'Yes,' or 'Okay.' Went through the complete will that way. 'Well,' I said, 'you're sure you want to make this will?' or something to that effect. He said: 'Yes,' he said, 'it's the same like it was yesterday.' And, we went through the ritual of executing the will. And, I told him at that time, again, I went through the fact that someone had to write his

name. He asked me to write it. Someone had to witness it. He said: 'Well, you and Rosie.' I said: 'All right.' And, we witnessed the will. Q. Getting down to the execution of the will, would you please tell the Court precisely the manner in which that instrument was executed? A. I then asked him if he could write his name. He said: 'No.' And, I asked him if he could make his mark. He said: 'Yes.' I said to him, I said: 'Now, someone has to sign your name. Who do you want to sign it?' He said: 'You.' I wrote his name, leaving a space between his first and his last name. Then, handed him the pen. I said: 'Now, you make the cross over here.' And, he made the cross. I took the pen, and, I wrote over the top of the X 'his' and below it 'mark,' and then, explained to him—or, it may have been even before, that we had to witness the will. But, anyhow, he said: 'You and Rosie sign it.' I think I signed it first. I don't have it here, but I probably would. And then, I handed the pen to Mrs. Benedict, and she signed it. . . . Q. Did you know any of the devisees named in this will? A. I only know—I do not know any of the four specific devisees; never knew them before. Q. The first time you ever heard their names mentioned, then, was on the 19th? A. Let me say this: I have heard the name of D'Allesandro, because, there are a few D'Allesandro families; but, I did not know any of these devisees in this will. Q. Now, with respect to the residuary legatee. Did you know Mrs. Benedict? A. Yes, I knew Mrs. Benedict, but, I would say, in all the years that I knew her, I don't think I spoke to her any more than ten minutes in all those years, prior to this occasion. . . . Q. Did you know, prior to July 19, 1955, who owned the several parcels of real estate which are concerned here? A. No, I did not. Q. You knew nothing about that real estate? A. Absolutely nothing. Q. During the time that

you spoke to the decedent, either on July 19th or on July 20th, was there any prompting from anyone with respect to the dissolution of this man's estate? A. No prompting whatsoever. . . ."

"BY MR. LOWE: Q. Is there anything else that you care to add, with respect to the execution of the last will? A. Only say this: that there never was, in my mind, any doubt whatsoever, that this man fully realized what he was doing, and fully appreciated the fact to whom he was leaving the property. There was never the slightest doubt—I took all precautions which I know in engaging him in conversation and making sure his answers were responsive, and going over with him, not only once, as on the 19th, but, also, again, on the 20th, and, I do not know—did not know at that time— the decedent, the fact that he owned this property which it eventually turned out that he did own, or anyone of the devisees of the will who were not in that room. I only know Rose Benedict, I would say, prior to that time a ten minutes' talking in all the years that I knew her. . . . I feel I am better qualified to determine whether or not a man has testamentary capacity, than any one else. And, if there was the slightest doubt in my mind, after I had spoken with him, and, purposely had this small conversation with him, I would have gone over for a doctor and a nurse—but, preferably, a doctor. . . . Q. And didn't you consider it a bit irregular to have a residuary legatee sign this will? A. Mr. Dennis, I will say this to you: over a period of four or five years, I have written, perhaps, a hundred and fifty wills, and, on those one hundred and fifty wills, I would say that out of one hundred and forty of those cases, one of the witnesses is a beneficiary under the will, because, that is usually the one who accompanies the person to your office."

The statements hereinabove quoted which the testator made to Mr. DiGiacomo in the presence of Rose Benedict and Marta Giondonato as to whom he wanted to leave each piece of real estate, and the gift to the church, and the gift of all that was left to Rose, and his funeral arrangements, and nothing for his wife— these are not matters of opinion—*they are statements of fact.* If those statements of fact are believed, as the jury and the hearing Judge believed them, it would be impossible to believe *the opinion evidence* of Dr. Rappaport, who testified that *in his opinion* it was impossible for the testator to have made those statements. It will likewise be recalled that Dr. Rappaport testified it would have been impossible for the testator to have had any of the conversations which the lay witnesses and the attorney for proponents testified he had with them during his ten day stay in the hospital. When you add to this the testimony of Dr. Carfagno, which conflicts with Dr. Rappaport's testimony in its important phases, it is impossible, on such opinion evidence, to overrule a jury and Judge who saw and heard the witnesses.

In *King Will,* 369 Pa. 523, 87 A. 2d 469, the Court said (page 531) : "This Court has frequently indicated that the draftsman of a will, especially if he be a lawyer, is always an important and usually the most important witness in a contested will case. . . ."

The majority opinion emasculates and erodes the well settled principle governing expert testimony which it purports to affirm, and makes the *factual* testimony of a lawyer who drew the will, which is believed by the jury and the Judge, merely equal to the testimony of experts who were not present at the time. If that is to be the law—contrary to all the prior decisions of this Court—the question naturally arises: What is

the use of having an attorney who draws the will and first carefully interrogates the testator as to his wishes and then explains the will to him paragraph by paragraph, if *opinion* evidence of a doctor who was not present can be equated to *factual* evidence of the attorney and the subscribing witness which, if believed, establishes beyond any possible doubt, the mental capacity of the testator?

The statements of fact which DiGiacomo and Rose Benedict testified were made by the testator on July 19th and on July 20th for the disposition of his property, and as to July 19th the corroborating factual testimony of the disinterested witness, Marta Giondonato, are not, as the majority opinion erroneously terms them, "opinion" evidence. That is the basic fallacy of the majority opinion. Those statements are CLEAR, BLAZING, BLARING, FACTUAL FACTS—facts that cannot be obliterated or erased; facts that, if believed, blast any medical opinions to the contrary into oblivion. This factual evidence—exactly what testator told the attorney-scrivener he wanted in his will—was believed by the hearing Judge who sat as jury and Judge. If the jury and the hearing Judge disbelieved DiGiacomo and Rose Benedict, then the opinion evidence of the doctors would prevail. If, on the other hand, the jury and the hearing Judge believed the factual testimony of the attorney who drew and witnessed the will, and the factual testimony of Rose Benedict and of Marta Giondonato, (as they did), *it follows as day follows night* that the testator had mental capacity and that the honest *opinion* of doctors who were not present at the time of the will, viz., that he could not have had mental capacity, "was of little weight and should be entirely disregarded when contrary to established facts revealing mental capacity." It is, we repeat, as simple as that!

I would affirm the Decree on the able opinion of President Judge TAXIS, who correctly stated and correctly applied the pertinent principles of law.