615 A.2d 65

## In re ESTATE OF Kalman KESSLER, Deceased.

### APPEAL OF Edward R. KESSLER and Howard J. Kessler, Co–Executors of the Estate of Kalman Kessler.

Superior Court of Pennsylvania.

Argued June 16, 1992.

Filed Sept. 29, 1992.

Richard H. Martin, Philadelphia, for appellant.

David Freeman, Philadelphia, for participating party.

144

Before ROWLEY, President Judge, and HUDOCK and BROSKY, JJ.

ROWLEY, President Judge:

In this appeal we are asked to review a decree of the Orphans' Court declaring that an inter vivos trust created by the late Kalman Kessler ("Father") for the benefit of his sons, appellants Edward R. Kessler and Howard J. Kessler ("Sons"), was not irrevocable but, because Father intended to retain ownership of the trust assets, was instead a testamentary disposition which was ineffective to defeat the elective rights of Father's widow, Muriel Kessler, appellee ("Wife"). For the reasons set forth below, we vacate the decree of the Orphans' Court.

On September 16, 1986, Father and Sons entered into a trust agreement which provides, *inter alia,* as follows:

Trustees [Sons] shall hold, manage, invest and reinvest the trust fund, collect the income arising therefrom, ... and shall pay over unto Trustor [Father], for and during his lifetime, the net income thereof.

Trustees shall pay so much of the principal of the trust fund as Trustor shall request in writing from time to time; provided, further, the aggregate of all such payments of principal so made unto Trustor upon his written request shall not exceed Ten Thousand ($10,000.00) Dollars in any calendar year in the aggregate; provided, however, that the decision to pay over principal to Trustor shall be exclusively within the discretion of the Trustees who shall be without liability for their decision not to pay over principal to Trustor.

Upon Trustor's death, Trustees shall divide the trust fund ... into shares for my then living issue, [the distribution to be made on a *per stirpes* basis].

The Trustor has had explained to him, and he understands, the consequences of an irrevocable trust, and he declares that he intends this trust to be irrevocable, and he retains no right to alter, amend or revoke the same.

On February 12, 1987, five months after the creation of the trust, Father married Wife. He executed a will, naming Sons as executors, on July 29, 1987. Father died on December 11, 1987.

Wife filed an election to take her one-third share of Father's property pursuant to 20 Pa.C.S. § 2203(a). In their Petition for Adjudication and Notices of Audit, Sons asserted that Wife had no interest in the trust. The account filed by Sons showed a balance of $11,858.88; it did not include the stock which constituted the trust assets, and which had a value at Father's death of $191,754.88. Wife filed objections in which she argued, *inter alia,* that the trust assets should have been treated as part of Father's estate and subject to her elective rights. A hearing concerning Wife's objections was held on February 6, 1990.

In an adjudication and decree dated February 13, 1991, the Orphans' Court found that Father never intended to divest himself of the ownership of the assets purportedly conveyed in trust and that "the trust [was therefore] a testamentary disposition which is ineffective to defeat the rights of his surviving spouse" (Adjudication at 28). The Court directed that the trust assets be treated as part of Father's estate and subject to Wife's elective rights. Sons filed exceptions. On November 13, 1991, an en banc panel of the Orphans' Court, with one member dissenting, entered a final decree dismissing the exceptions and confirming the adjudication. Sons then filed this timely appeal.

Although appellants raise four issues, these issues essentially involve a single claim: that the evidence of record does not support the finding of the Orphans' Court that Father intended to and did retain ownership and control of the assets purportedly conveyed in trust. Our role in reviewing this claim is to determine whether the record is free from legal error and whether the findings of the Orphans' Court are supported by competent and sufficient evidence and "are not predicated upon capricious disbelief of competent and credible evidence." *In re Estate of Dembiec,* 321 Pa.Super. 515, 520, 468 A.2d 1107, 1110 (1983). The findings of an Orphans' Court

judge who heard the testimony of witnesses are to be given the same weight as a jury verdict, particularly when those findings are based on determinations of credibility. *Id.* The test to be applied is not whether we, the reviewing court, would have reached the same result, but whether a judicial mind, after considering the evidence as a whole, could reasonably have reached the same conclusion. *In re Masciantonio's Estate,* 392 Pa. 362, 367, 141 A.2d 362, 365 (1958).

Concerning the validity of inter vivos trusts, our Supreme Court has said the following:

> While the cases so vary in their facts as to prevent the application of a general governing principle of law, some definite rules have emerged. They are summarized in *In re Shapley Trust,* 353 Pa. 499, at pages 500, 501, 46 A.2d 227 ...: "It will suffice to say that where the deed [trust instrument] vests a present interest in the beneficiaries it is a valid inter vivos trust. It is not rendered testamentary in character because the settlor reserves a beneficial life estate, and in addition, a power to revoke or modify in whole or part. Where, however, settlor, in addition to the reservations above mentioned, reserves the power to control the trustee as to the details of the administration of the trust, and thus makes the trustee merely the agent of the settlor, the scheme becomes testamentary as to dispositions intended to take effect after death."

*In re Pengelly's Estate,* 374 Pa. 358, 363–64, 97 A.2d 844, 846 (1953) (additional citations omitted; bracketed insertion in original). Wife's right of election is set forth in the Probate, Estates and Fiduciaries Code as follows:

> (a) **Property subject to election.**—When a married person domiciled in this Commonwealth dies, his surviving spouse has a right to an elective share of one-third of the following property:
>
> .    .    .    .    .
>
> (3) Property conveyed by the decedent during his lifetime to the extent that the decedent at the time of his death had

a power to revoke the conveyance or to consume, invade or dispose of the principal for his own benefit.

.    .    .    .    .

In construing this subsection, a power in the decedent to withdraw income or principal, or a power in any person whose interest is not adverse to the decedent to distribute to or use for the benefit of the decedent any income or principal, shall be deemed to be a power in the decedent to withdraw so much of the income or principal as is subject to such power, even though such income or principal may be distributed only for support or other particular purpose or only in limited periodic amounts.

20 Pa.C.S. § 2203(a). The Official Comment which accompanied the 1978 enactment of this provision includes the following statement:

It is intended that the spouse should have a right of election only with respect to assets which the decedent retained the right or power to enjoy during his lifetime. This should not include property which the decedent has given away absolutely and cannot recapture for his own benefit, even though he has retained a power of appointment which cannot be exercised in his favor during his lifetime.

In order to understand the trial court's findings, we turn first to the evidence offered at the hearing. David S. Workman, Esquire, the lawyer who prepared the trust for Father, testified as follows: During the latter half of August, 1986, Father consulted Mr. Workman because he had met someone whom he might marry and he wanted to insure that his assets would go to Sons at his death. Father explained that the income from his investments was sufficient for his needs, that the management of his assets had become burdensome to him, and that he wanted Sons to take over the management of the assets. Mr. Workman first suggested that Father enter into an antenuptial agreement with his future spouse, but Father suggested that such a device might be distasteful. Mr. Workman then suggested, as another means to the same end, an irrevocable trust. He explained to Father that if he placed his assets in such a trust he could never get them back again. He

also asked Father whether he thought he would ever need the trust principal, and Father replied that he did not think so. Mr. Workman suggested that Father might at least want to reserve the right to ask the trustees for some of the principal each year, with the trustees having the power to grant or deny his request, and Father agreed to such a provision in the amount of $10,000 per year. To the best of Mr. Workman's knowledge, Father funded the trust with substantially all of his liquid assets. Mr. Workman sent his bill for preparing the trust agreement to Howard Kessler.

Bennett Broad, senior vice president of Dean, Witter, Reynolds, Inc., testified that the firm received stock certificates in the name of Kalman Kessler, re-registered them in the name of the Kalman Kessler Trust, and sent them to the address of the trust, which was also the address of Father's residence. Mr. Broad explained that Father had always preferred to hold his own securities rather than leave them with the broker. He emphasized that even if Father had the stock certificates in his possession, he would be unable to do anything with them, as they could be negotiated only by the trustees. The trustees, however, would have to get the certificates from Father in order to do so. Similarly, the dividend checks were registered in the name of the trust and only the trustees would have the power to cash them, regardless of where they were sent. After the formation of the trust, according to Mr. Broad, there were five transactions involving the securities in the trust, and all of those transactions were made at Sons' direction. Mr. Broad described a conversation with Father as follows:

Q: What was the occasion for that conversation? Were you explaining to him what the trust meant?

A: No, I'm not his attorney. Again, I am just his custodian. But ... Kalman was very concerned about the receipt of his dividends and the—and knowing that everything was in order in his life. He was very fastidious that way, and he called us constantly to make sure that things were done. And in just one of our conversations I mentioned to him that his—that he had

no power over this trust whatsoever; we were not able to take any instructions from him relative to this trust as he did not own this trust.

Q: But he wanted to get the dividends himself; is that correct?

A: No. We informed him at the time of the establishment of this trust that the irrevocability of it was such that the dividends were to be ultimately received by the trustees. He only asked they be sent to him because he could take the burden of the bookkeeping off of his sons.

N.T. at 32–33. Mr. Broad also testified that Father never tried to instruct him on the disposition of the securities.

Wife testified that she and Father decided to marry in the late spring of 1986 and made a definite decision to that effect around Thanksgiving of that year. Before the marriage, according to Wife, Father promised her that when they married she would receive $140,000 to $160,000, as well as a car, an apartment, and jewelry, and that "he would leave me in a much better position than my first husband had ..." (N.T. at 47). Wife testified that she first learned about the trust after the marriage, when she found in the mail a letter apparently enclosing a dividend check from the trust. Father and Wife "had words about it ... and he flew up and he said everything would work out" (N.T. at 48). Wife occasionally saw Father filling out deposit slips after receiving such envelopes.

Bernice Kessler, wife of Howard Kessler, testified that after Father received the stock certificates that had been reissued in the name of the trust, he asked her to put them in a safe deposit box and she did so, placing them in a box that was in her name only. On two or three occasions she removed certificates from the box at the direction of her husband and his brother so that they could execute transactions involving those certificates. She explained that dividend checks were endorsed by her husband and his brother and then turned over to Father, who deposited them or cashed them. With regard to the family relationship, she testified as follows:

Q: I assume ... that your relationship to your father-in-law was extremely close.

A: That's correct.

Q: He trusted you implicitly?

A: I would certainly think so.

Q: Did he discuss with you drawing up the trust?

A: I was in on the discussions when he was planning it.... I worked in my husband's office, and my father-in-law was in the office every day at some time or another.

Q: He made deliveries for your husband, did he not?

A: That is correct.

N.T. at 134–35.

Howard Kessler and Edward Kessler testified that after the trust was formed Father asked them if they would lend him the money to buy a car and they agreed to do so, with Father giving them a promissory note for the sum involved, $10,800.[1] Howard Kessler testified that Mr. Workman's bill for setting up the trust was paid from his personal account. Edward Kessler described the family relationship as follows:

My brother and I are very close. He calls me. I go to his office. It is a matter of fifteen or twenty blocks away from me. I see my father there. We meet for lunch. We do a lot of things.

N.T. at 147. In addition, there was the following exchange:

Q: Were you ... willing to trust your sister-in-law Bernice with these stock certificates?

A: Absolutely.

Q: You have a great deal of faith in her?

A: I have a great deal of faith in all of my family, sir.

N.T. at 154.

After examining "the pattern of behavior and course of conduct of the decedent in regards to his assets and his

---

1. However, as noted below, the Orphans' Court found Sons' testimony in this matter to be incredible and concluded that the alleged "loan" was a sham, with Sons never expecting to be repaid by Father.

marriage" (Adjudication at 26), the Orphans' Court reached the following conclusion:

This was a close knit family. They saw each other daily. They trusted each other implicitly. In all of his dealings with his children, Kalman Kessler was the instigator, leader and director of action. The sons and daughter-in-law did what the decedent told them to do when he told them to do it. Kalman Kessler was a very fastidious man who was in complete control of his assets and family at all times. In light of the foregoing, this Court finds that Kalman Kessler never intended to divest himself of the ownership of the assets which he purportedly conveyed in trust on September 16, 1986; that Kalman Kessler decided to marry Murial [sic] Kessler and looked for devices to insure that she would not get her hands on his assets; that Kalman Kessler did not voluntarily and knowingly cut himself off from his assets and did not place himself at the mercy of his sons; that the sons always understood that their father was still in charge of his assets, that is, that he was the principal and they were his agents. We further find that Kalman Kessler did not give up any control of his assets when he gave the stock certificates to his daughter-in-law to hold in her safe deposit box; that the daughter-in-law stood ready, at his request, to deliver the certificates back to the decedent; and, that the sons stood ready, at the request of their father, to pay all of the trust assets to him. This Court finds that the sons had no interest in the trust which was adverse to that of their father because, as a matter of fact, the sons stood ready to do their father's bidding at all times. No matter how colorable the terms of the Trust Agreement of September 16, 1986, the fact that Kalman Kessler never intended to divest himself of ownership of the assets which he purportedly conveyed in trust makes the trust a testamentary disposition which is ineffective to defeat the rights of his surviving spouse.

Adjudication at 27–28. The Court added that after observing the demeanor of Howard, Bernice, and Edward Kessler, and after considering Sons' substantial interest in the outcome of

the proceedings, it found the testimony of the three witnesses to be incredible in the matter of the automobile "loan" and in all other respects as well.

It is evident that the Orphans' Court considered the matters before it with considerable care and in great detail. The Court's frustration with the evasiveness of the Kessler witnesses, which is apparent even from our reading of the "cold" record, is understandable. We are aware of the Court's findings, which have not been challenged on appeal, that "the decedent's sons have conducted themselves, as executors, in a manner clearly calculated to frustrate the surviving spouse and protect their interests ..." (Adjudication at 29). Nevertheless, when we leave the matter of *Sons' conduct* in the administration of Father's estate and turn to the matter of *Father's intent* in establishing the trust, we are constrained to hold that the Orphans' Court's findings of fact are unsupported by competent evidence and are made in "capricious disregard" of such evidence.

■  First, the Orphans' Court analysis does not take into account the most direct evidence of Father's intent, namely, the testimony of his lawyer, David Workman.[2]  According to this witness, Father wanted to have Sons take over the management of his liquid assets and to insure that Sons received them after his death.  It was Mr. Workman, not Father, who suggested placing the assets in an irrevocable trust.  It was also Mr. Workman who suggested that Father might wish to retain the right to request a certain amount of the principal; Father's initial reaction was that he would not need any of the principal because the income from the securities would be sufficient for his needs.  Mr. Workman testified

---

2.  Mr. Workman testified that he was not related to anyone in the Kessler family and that he did not represent Edward or Howard Kessler when Father consulted him about the trust.  After Father died, Mr. Workman wrote wills for Sons and their wives, and he represented the Kessler family in connection with the probate of Father's estate.  The Orphans' Court found that Mr. Workman "has clearly devoted much more time to the defense of his clients' interests, as individuals, than he has devoted to advising them on how to administer this estate" (Adjudication at 31).  The Court did not suggest, however, that Mr. Workman's testimony was unreliable.

emphatically that Father understood the irrevocability of the trust. As was noted by Judge Bruno, who dissented from the Court en banc's decision in the matter, this testimony was uncontradicted. There is no evidence in the record that Father intended to do otherwise than establish an irrevocable trust.

█ Second, there is no evidence that Father ever attempted to exercise control over his assets after the trust was established. Bennett Broad, the Dean, Witter executive, testified that he informed Father that only Sons, as trustees, could give instructions concerning the trust and, more importantly, that Father never attempted to instruct him on the disposition of the securities in the trust. This testimony is also uncontradicted. According to Mr. Broad, all of the transactions involving the trust securities, three of which occurred before Father's death, were ordered by Sons, the trustees. That Father "was very concerned about the receipt of his dividends," as Mr. Broad testified, is unsurprising given the fact that he was entitled to receive the net income from the Trust. In addition, although Bernice Kessler testified that Father gave her the securities to place in her safe deposit box, there was no testimony indicating that Father ever sought to have them returned to him, nor was there any evidence that he tried to interfere when Bernice Kessler retrieved certain securities at Sons' request.

█ Our review of the factual record reveals a similar lack of support for the Orphans' Court's findings concerning the Kessler family's purported willingness to do Father's bidding. While there is indeed evidence that the Kesslers were a close-knit family whose members saw each other daily and trusted each other implicitly, there is no evidence to indicate that "the sons and daughter-in-law did what the decedent told them to do when he told them to do it." Bernice Kessler was not asked whether she would have returned the stock certificates to Father if he had asked for them. It does not follow automatically from Sons' willingness to give Father the sum of $10,800 to enable him to buy a car that Sons would have been equally willing to relinquish their interest in assets worth

more than $190,000 if Father had asked them to do so.[3] The Orphans' Court's finding that there existed an "esoteric understanding" between Father and Sons is simply not supported by the record.

Wife describes as inconceivable the suggestion that a person who was retired and lacking any means of support would give away all of his securities, "leaving himself penniless and at the complete mercy of his sons" (Brief for Appellee at 9). As Mr. Workman's testimony indicated, however, Father was not lacking in income; to the contrary, Father thought that the income from the Trust would be adequate for his needs. Moreover, it is not beyond comprehension that a parent who believed himself to be loved and trusted by his children would willingly relinquish control of his assets, secure in the belief that his children would care for him in the unlikely event that his income proved inadequate to the task.

■ We emphasize one final point. The Orphans' Court's finding that Father "looked for devices to insure that [Wife] would not get her hands on his assets" (Adjudication at 27) is supported by the record. However, Father was *permitted* to place those assets beyond the reach of his future spouse, provided that he intended to relinquish control of the assets. *See* 20 Pa.C.S. § 2203(a)(3), *supra*. The Orphans' Court, despite its pejorative description of Father's aim, acknowledges as much. We are not required to decide whether we approve of Father's aim, but only whether the evidence of record supports the Orphans' Court's finding that Father intended to and did retain ownership and control of the trust

3. We note that the Orphans' Court's findings as to Sons' interest in the trust are contradictory. On page 28 of the adjudication the Court, addressing Wife's claim that the Trust assets should be considered part of Father's estate because he retained control over the assets, states that "the sons had no interest in the trust which was adverse to that of their father because, as a matter of fact, the sons stood ready to do their father's bidding at all times." On page 24, however, the Court states that "the sons, as issue of the decedent, had an interest in the principal which was adverse to that of the decedent." The latter statement was in response to Wife's claim that she had a right to an elective share of the trust assets "by reason of the power of the decedent's sons, as trustees, to make distributions of principal to him" (Adjudication at 24).

assets. We conclude that it does not and, therefore, that the Kalman Kessler Trust was not a testamentary disposition but a valid inter vivos trust, the assets of which are not subject to Wife's elective rights. Accordingly, we vacate the decree insofar as it holds to the contrary and remand the case to the Orphans' Court with instructions that the trust assets are not to be treated as part of Father's estate.

Decree vacated. Case remanded to the Orphans' Court for further proceedings consistent with this memorandum. Jurisdiction relinquished.